## COMMONWEALTH vs. CONAN GENTILE.

Worcester. November 7, 2013. - January 14, 2014.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Search and Seizure,* Arrest, Warrant, Reasonable suspicion, Consensual entry
by police, Fruits of illegal search. *Constitutional Law,* Search and seizure,
Arrest, Reasonable suspicion. *Evidence,* Result of illegal search. *Practice,
Criminal,* Motion to suppress. *Receiving Stolen Goods.*

A Superior Court judge erred in denying a criminal defendant's pretrial mo-
tion to suppress evidence of stolen property that was observed by a police
officer after entering the defendant's residence to execute a warrant for his
arrest, where there was insufficient evidence to support a reasonable belief
that the defendant was in the residence at the time the warrant was executed,
in that the officer arrived at the residence after the commencement of the
normal work day and had obtained no information that the defendant was
there; and in that no reasonable inference that the defendant was there
arose from the nervousness of the person who answered the door, her look-
ing back toward a bedroom, or the officer's experience in executing arrest
warrants [820-830]; and where the connection between the illegality of the
entry to execute the arrest warrant and the defendant's later consent to
search the residence was sufficiently intimate that the consent could not be
found to have been so attenuated from the illegal entry as to be purged
from its taint [830-832].

INDICTMENTS found and returned in the Superior Court Depart-
ment on August 13, 2010.

A pretrial motion to suppress evidence was heard by *James
R. Lemire*, J., and the cases were tried before *Janet Kenton-
Walker*, J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Cathryn A. Neaves* for the defendant.

*Jane A. Sullivan*, Assistant District Attorney, for the
Commonwealth.

GANTS, J. The Fourth Amendment to the United States Con-
stitution and art. 14 of the Massachusetts Declaration of Rights

require that police who enter an individual's residence to execute an arrest warrant "have a reasonable belief that the location to be searched is the arrestee's residence, and a reasonable belief that the arrestee is in his residence at the time the arrest warrant is executed." *Commonwealth* v. *Silva*, 440 Mass. 772, 778 (2004). See *Payton* v. *New York*, 445 U.S. 573, 603 (1980) ("an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives where there is reason to believe the suspect is within"). In *Silva, supra* at 776-777, we stated that the "reasonable belief" standard is "less exacting than probable cause." The issue presented in this case is how much less exacting. We conclude that a "reasonable belief" requires more than was known here at the time of entry. Therefore, the entry was unconstitutional under both the Fourth Amendment and art. 14, and the observation and subsequent seizure of the stolen property allegedly received by the defendant in this case should have been suppressed as a fruit of the illegal entry. Because both of the defendant's convictions for receipt of stolen property, in violation of G. L. c. 266, § 60, rest entirely on this illegally seized property, we vacate the convictions and remand the case to the Superior Court for entry of an order of dismissal.

*Background.* We summarize the relevant evidence in the Commonwealth's case-in-chief at trial, and reserve the evidence presented at the motion to suppress hearing for our discussion of that motion.

Approximately one week before the defendant's arrest, State Trooper David Napolitano spoke to the defendant in an unrelated incident and viewed his Massachusetts identification card, which identified his address as an apartment in Leominster. On June 24, 2010, Trooper Napolitano, assisted by Leominster police Detective Scott Wolferseder and two police officers, went to this address to execute two outstanding arrest warrants.

After the trooper knocked on the back door several times, a teenage girl, Daisy Stanley, answered the door and her mother, Maura Stanley, came out of a bedroom and approached the door.[1] After speaking briefly with Maura, the trooper entered

---

[1] We shall refer to Daisy and Maura Stanley by their first names to avoid confusion.

the apartment, pushed open the door of the bedroom that faced the back door, and found the defendant. After the trooper noticed the "butt end" of what appeared to be a rifle (but was actually an antique musket) sticking out from under the bed, the trooper handcuffed the defendant and asked him if there were any weapons in the apartment. The defendant replied that there were no firearms, but that a knife was on the dresser. The trooper then removed the musket from beneath the bed, at which point he observed three firearm cases. He opened two of the cases and found a shotgun in each; the third, labeled "Beretta," which the trooper knew was a type of firearm, was empty. The trooper asked the defendant about the firearms, and the defendant said they were not his and he did not know where they had come from. The defendant then began "yelling that [the officers] were illegally searching his bedroom." The trooper noticed a large sword and scabbard in the corner of the bedroom, but the officers seized only the musket, firearms, and firearm cases.

The officers transported the defendant to the State police barracks, where he was advised of and waived his Miranda rights, and agreed to speak to the police. A Sterling police officer arrived with a police report about a breaking and entering that had occurred on June 15, 2010, in which the musket and firearms seized from the defendant's bedroom, among other items, had been stolen. The trooper "relayed" the list of stolen items, which also included a sword and three BB guns, to the defendant. The defendant told the officers that the musket and the firearms seized from the bedroom had been taken in that burglary, and that the sword and one of the BB guns were still in the apartment. The defendant denied having stolen the items, but said he knew who had committed the crime and did not want to tell the police who it was. The trooper asked for the defendant's consent to search the apartment for the sword and BB gun. The defendant agreed to the search and signed a "consent to search" form. The officers then returned to the apartment and found the sword behind the door of the bedroom where the defendant had been arrested and the BB gun near the closet on the other side of the room.

The defendant was charged in five indictments alleging receipt of stolen property, with each indictment charging receipt of one

of the five items of property found in the bedroom.[2] A Superior Court jury convicted the defendant only of the two indictments alleging receipt of the stolen sword and of the BB gun.[3]

The defendant appealed, and we transferred the case here on our own motion. On appeal, the defendant argues that the judge erred in denying his motion to suppress because the arrest warrants did not authorize the police to enter the apartment where they did not have a "reasonable belief" that he was present in the apartment, and that the subsequent seizure of the sword and BB gun was the "fruit" of this unconstitutional entry.[4]

*Discussion.* "In reviewing a motion to suppress, 'we accept the judge's subsidiary findings of fact absent clear error.' " *Commonwealth* v. *Pacheco*, 464 Mass. 768, 769 (2013), quoting *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004). But we "independently determine the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *DePeiza*, 449 Mass. 367, 369 (2007), quoting *Commonwealth* v. *Catanzaro*, 441 Mass. 46, 50 (2004). We summarize the judge's rather spare findings of fact regarding the entry into the home, made orally following an evidentiary hearing where Trooper Napolitano was called to testify by the Commonwealth, and Detective Wolferseder and Daisy were called to testify by the defendant. We supplement the judge's findings with additional details from the testimony of Trooper Napolitano because the judge found his testimony to be "cred-

---

[2]The grand jury also returned two indictments charging the defendant with unlawful possession of a firearm, in violation of G. L. c. 269, § 10 (*h*), and with being an armed career criminal, as defined in G. L. c. 269, § 10G (*c*).

[3]The jury found the defendant not guilty of the indictments alleging unlawful possession of a firearm. Because of these acquittals, the defendant also was found not guilty of being an armed career criminal.

[4]The defendant also argues that (1) the evidence at trial of his constructive possession of the sword and BB gun was insufficient as a matter of law to support his convictions of receiving stolen property; (2) the absence of a jury instruction regarding constructive possession with respect to the receipt of stolen property charges created a substantial risk of a miscarriage of justice; and (3) the convictions were duplicative, in violation of double jeopardy, where there was no evidence that the defendant separately received the sword and BB gun. Because we conclude that the defendant's motion to suppress should have been allowed, and that the convictions must be vacated and an order of dismissal entered because of the suppression of evidence of the stolen property, we do not reach the other three grounds of appeal.

ible in its entirety." See *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007), *S.C.*, 450 Mass. 818 (2008), and cases cited.[5]

Trooper Napolitano was "an experienced [seventeen-year] veteran of the State Police." His duties for the two years prior to the motion hearing included executing outstanding arrest warrants, during which he had arrested more than 200 people on warrants, including more than one hundred people in their homes. According to the motion judge, "[t]he trooper has developed a sense of sincerity or credibility when he's executing these warrants, because he's often found that people will misrepresent . . . a person's presence in the dwelling."

At some time during the week before the arrest, the trooper encountered the defendant and saw the defendant's Massachusetts identification card that indicated that his address was an apartment in Leominster. The trooper subsequently learned that two valid arrest warrants had been issued against the defendant.[6] On June 24, 2010, after confirming that the address on the defendant's identification card matched the address listed on the defendant's driver's license, the trooper, assisted by Leominster police officers, went to the apartment at approximately 9:30 A.M. and spoke with Maura. The judge found that the trooper's "observations of her, based on his experience and training, led to a reason to believe the defendant was present in the house."

The trooper testified that, before he knocked on the door, he had no information to indicate that the defendant was home. When Maura came to the door, he told her that he was looking for the defendant and had a warrant for his arrest. There was a

---

[5]In *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007), *S.C.*, 450 Mass. 818 (2008), and cases cited, we stated, "Appellate courts may supplement a judge's finding of facts if the evidence is uncontroverted and undisputed and where the judge explicitly or implicitly credited the witness's testimony." Here, Trooper Napolitano's testimony was controverted and disputed, but we nonetheless include his testimony because we conclude that, even if the judge had explicitly made findings adopting every factual assertion in his testimony, the findings would still fall short of establishing a reasonable belief that the defendant was in the home at the time of entry. We do not supplement the judge's findings with the testimony of Daisy or Detective Wolferseder because the judge expressly did not credit Daisy's testimony and said nothing about the credibility of Detective Wolferseder's testimony.

[6]Trooper Napolitano described the warrants as "two open motor vehicle warrants."

young girl standing with her, whom he later learned was her daughter. Maura appeared nervous. She said, "No, he's not here," and looked toward a bedroom that was straight across from where the trooper stood, the door to which was "probably half to three-quarters open." She stated that the defendant was not there "a couple times." He heard other "movement," indicating to him that somebody else was in the apartment, but he could not see anyone else in the apartment and "didn't know who was there."[7] He told Maura that he believed the defendant was there, walked past her into the apartment, and entered the bedroom straight across from him, where he found the defendant.

The defendant correctly does not challenge the judge's finding that the officers had a reasonable belief that the defendant resided at the apartment. Therefore, we limit our analysis to whether the evidence at the suppression hearing was sufficient to support a "reasonable belief that the arrestee [was] in his residence at the time the arrest warrant [was] executed." *Commonwealth* v. *Silva*, 440 Mass. at 778. Reasonable belief is an objective standard. *Commonwealth* v. *Webster*, 75 Mass. App. Ct. 247, 251 (2009), citing *Silva*, 440 Mass. at 779 n.8. Trooper Napolitano's good faith subjective belief that the defendant was in the house was not enough, by itself, to satisfy the standard. See *Webster, supra,* quoting *Commonwealth* v. *Grandison,* 433 Mass. 135, 139 (2001). Rather, a law enforcement official's belief must be supported by "specific articulable facts" that, based on the totality of circumstances, permit a reasonable inference that, at the time of entry, the defendant is in the premises. *Webster, supra,* quoting *Grandison, supra.* See *United States* v. *Bervaldi,* 226 F.3d 1256, 1263 (11th Cir. 2000), quoting *United States* v. *Magluta,* 44 F.3d 1530, 1535 (11th Cir.), cert. denied, 516 U.S. 869 (1995) (reasonable belief depends on "facts and circumstances within the knowledge of the law enforcement agents . . . viewed in the totality"). The entering officer's experience or expertise may bear on the strength of that inference, but only to the extent the officer can articulate what he has learned from his experience or expertise that reasonably would permit an inference from information that otherwise

---

[7]After Trooper Napolitano arrested the defendant, he learned that there was a fourth person in the apartment, who was the defendant's daughter.

would not suffice. *Grandison, supra* ("inferences that follow from the officer's experience"). *Commonwealth v. King*, 389 Mass. 233, 243 (1983) ("A trained law enforcement officer may draw inferences and make deductions that would elude a lay person"). The inference need not meet the standard of probable cause, see *Silva, supra* at 777-778, but it must be sufficiently strong to justify invading the sanctity of the home to attempt to execute an arrest warrant within the home.

Here, before the trooper knocked on the door of the residence, he had learned that the defendant identified the residence as his home on his Massachusetts identification card and driver's license, but he admittedly had no information to indicate that the defendant was inside the residence at that particular time. See *United States v. Werra*, 638 F.3d 326, 339 (1st Cir. 2011) ("officers must point to at least some evidence suggesting that the individual named in the arrest warrant is present"). No physical surveillance was conducted of the address earlier that morning, nor did any third party inform the trooper that the defendant was present. Contrast *Silva*, 440 Mass. at 774 (police officer saw person consistent with description of subject of arrest warrant through hole in plywood used to cover up apartment window); *United States v. Pruitt*, 458 F.3d 477, 479, 483 (6th Cir. 2006), cert. denied, 549 U.S. 1283 (2007) (police observed man enter and then exit defendant's suspected residence, and after being stopped by police, man told officers he had been attempting to purchase drugs from defendant inside residence); *United States v. Gay*, 240 F.3d 1222, 1227-1228 (10th Cir.), cert. denied, 533 U.S. 939 (2001) (confidential informant told officers that defendant was currently inside residence). Nor was there any evidence that the defendant had been linked to any motor vehicle parked outside the residence. See *United States v. Magluta*, 44 F.3d at 1538 ("The presence of a vehicle connected to a suspect is sufficient to create the inference that the suspect is at home"). See also *United States v. Route*, 104 F.3d 59, 61-62, 63 (5th Cir. 1997) (reasonable belief where two subjects of arrest warrant lived together, one was arrested while backing his vehicle out of driveway, officers could hear television inside residence, and second vehicle remained in driveway); *United States v. Edmonds*, 52 F.3d 1236,

1248 (3d Cir. 1995), vacated on other grounds, 80 F.3d 810 (1996) (reasonable belief where agents arrived outside apartment at 6:45 A.M. and observed vehicle used by defendant parked in front, and at 9:30 A.M. observed that all vehicles but defendant's had left complex and no one had left defendant's apartment).[8]

Even with no information regarding the defendant's presence, if the trooper had entered the residence earlier in the morning, the early morning hour alone would have sufficed to warrant a reasonable belief that the defendant was home. See *United States* v. *Magluta*, 44 F.3d at 1535 ("officers may presume that a person is at home at certain times of the day — a presumption which can be rebutted by contrary evidence regarding the suspect's known schedule"). See also *Commonwealth* v. *DiBenedetto*, 427 Mass. 414, 417-418 (1998) ("early morning entry" between 5 A.M. and 6 A.M. provided "reason to believe" defendant was home); *United States* v. *Thomas*, 429 F.3d 282, 284, 286 (D.C. Cir. 2005) (where entry was between 6 A.M. and 6:30 A.M., "early morning hour was reason enough" to support reasonable belief that defendant was home); *United States* v. *Bervaldi*, 226 F.3d at 1267 ("reasonable to believe, in the absence of contrary evidence, that [suspect] would be at his residence at 6:00 in the morning"). Cf. *Commonwealth* v. *Tatum*, 466 Mass. 45, 53 (2013), cert. denied, 134 S. Ct. 830 (2013) (probable cause standard for search warrant met where officer observed defendant inside third party's residence in afternoon and warrant executed next day at 5:30 A.M.). But the trooper did not arrive at the residence until approximately 9:30 A.M. on a weekday, well after the start of the normal work day. See *United States* v. *Werra*, 638 F.3d 326, 340 (1st Cir. 2011) ("Entering a home at 10:00 A.M. is significantly different from entering at 5:00 or 6:00 A.M., when even working individuals can reasonably be presumed to be at home"). And there was no evidence as to whether the defendant was or was not employed, or had any daily routine, that would permit an inference that the defendant was likely to be home at that time. See *id.* (where there was

_____

[8]Here, the trooper testified that he did not believe the defendant had a car, but he did not indicate the factual basis for his belief or reveal how or when he learned this.

no evidence whether defendant was employed or "about her nighttime and daytime routines," "there [was] no evidence to suggest that [defendant] ordinarily would be home at 10:00 A.M. on a weekday"). Contrast *United States* v. *Lauter*, 57 F.3d 212, 215 (2d Cir. 1995) (reliable confidential informant, whose father was landlord of relevant apartment, told law enforcement agents that defendant was "unemployed and typically slept late, thus supporting a reasonable belief that [the defendant] was present").

Because the trooper arrived at the residence after the commencement of the normal work day and had obtained no information that the defendant was there, any information supporting a reasonable belief that the defendant was inside the residence only could have been obtained after the trooper knocked on the door and before he entered the residence. The information that the Commonwealth contends supported a reasonable belief was (1) after seeing the trooper and Detective Wolferseder at the door and learning that they had a warrant for the defendant's arrest, Maura appeared nervous and occasionally avoided making eye contact with the trooper, (2) Maura said "he's not here" a couple of times and looked back in the direction of a bedroom, and (3) the trooper heard "movement" inside the house. If there were a reasonable belief that the defendant was present in the residence, it must rest on this information alone.

We recognize that a preexisting reasonable belief that a defendant is present in a residence is not "dissipated" by a relative's or friend's insistence that the defendant is not there, "for the statement may well 'have been an effort to divert the search and facilitate escape and concealment.' " 3 W.R. LaFave, Search and Seizure § 6.1(a), at 269 (4th ed. 2004), quoting *Hawkins* v. *United States*, 319 A.2d 328, 329 (D.C.), cert. denied, 419 U.S. 969 (1974). But we have found no case where a statement by a person answering the door that the defendant is not at home has been given affirmative weight and treated as if it were akin to a statement acknowledging the defendant's presence because the officer had determined she was lying.[9] See *People* v. *Jacobs*, 43 Cal. 3d 472, 479 (1987) (where child told law enforcement

---

[9]We have found two Federal cases where the court attributed reasonable meaning to the nonverbal conduct of another person in a residence. In *United*

officer that defendant would be back in an hour, officer's "experience with fibbing children, . . . absent any indication that [child] was a member of that class, cannot supply the objective reasonable belief required").

The evidence that Maura was lying is not so compelling that this should be the first case where "no, he is not here" should be interpreted to indicate that the defendant was in the residence. We know now that Maura was, in fact, lying because the defendant was indeed in the bedroom, but our analysis of reasonable belief must not be influenced by what was learned after entry. *Commonwealth* v. *Silva*, 440 Mass. at 781 n.11, citing *Valdez* v. *McPheters*, 172 F.3d 1220, 1227 (10th Cir. 1999) ("the test to determine the propriety of the entry considers only the circumstances known to the police at the time of the entry into the residence"). A hunch is still a hunch, even if it turns out to be correct. And if the belief were reasonable, it would remain so even if the defendant was not in the residence.

The trooper stated that Maura's "nervousness and her look-

States v. *Jackson*, 576 F.3d 465, 467 (7th Cir.), cert. denied, 558 U.S. 1062 (2009), the court noted that the primary tenant, when shown a photograph of the defendant, "professed not to recognize [the defendant,] but the officers judged from her body language that she was lying." The officers, however, in contrast with Trooper Napolitano, did not rely on their evaluation of her credibility to enter the premises to search for the defendant. That occurred only after they showed the photograph to another woman who was sitting nearby and asked her if he was in the apartment. She "nodded yes and started crying," and they then followed her to the room where the defendant was sleeping. *Id.* at 467, 469. In *United States* v. *Stinson*, 857 F. Supp. 1026, 1027 (D. Conn. 1994), the officers twice asked the woman who answered the door to the apartment where the defendant was, and she "looked over her shoulder, turned toward the back of the apartment, and then turned back to face [the officer], indicating to [the officer] that [the defendant] was in the back of the apartment." In contrast with the instant case, the woman did not deny that he was there, and the officer did not conclude that she was lying; rather, the judge understood her to be communicating to the officer that the defendant was in the apartment. Moreover, the entry in that case occurred at approximately 7 A.M., and the judge concluded that the early hour was sufficient by itself to justify a reasonable belief that he would be at home at that time. *Id.* at 1031. The nonverbal conduct in these cases was not accompanied by a verbal denial that the defendant was in the apartment; rather, they were reasonably understood to indicate affirmatively that the subject of the warrant was there. Accordingly, neither of these cases suggests that Trooper Napolitano's subjective belief that Maura was lying because she appeared nervous and turned around to look toward the bedroom would support a finding of a reasonable belief.

ing back would lead [him] to believe . . . that [the defendant] was there." That someone appears nervous when police officers show up at her door with an arrest warrant does not, without more, give rise to an inference that the subject of the warrant is home.[10] Her looking back in the direction of the bedroom potentially may suggest that she was checking to see whether the defendant was visible to the police officers. But, stripped of the benefit of hindsight, there are so many other plausible reasons why she may have looked back that any inference from this conduct is too weak to be reasonably relied on as a justification to enter a person's home. Cf. *Commonwealth* v. *Cruz,* 459 Mass. 459, 462, 468 (2011) (defendant's lack of eye contact and "nervous demeanor" could not be "grounding factor" on which reasonable suspicion could be based where "a myriad number of innocent reasons other than hiding criminal contraband may more readily explain why a nineteen year old man would appear nervous while being addressed by a police officer").

Nor are we persuaded that the trooper's training and experience allowed him reasonably to infer from Maura's conduct that the defendant was home. When asked how his training and experience influenced his "thinking in regards to what [Maura] was telling [him] outside of [the] apartment," the trooper replied:

> "Just the sincerity dealing with people. I have good judgment of people whether they're telling the truth or lying, and the nervousness when someone's talking to you and they're not making eye contact. You're asking them questions and they're looking around, almost looking like someone's hiding as you're talking to them-type thing. Catch them in some lies."

Many studies have determined that law enforcement officers are more confident in their ability to ascertain whether someone is lying than is warranted by the empirical evidence.[11] Our experience with cross-examination in the court room teaches us that

---

[10]The trooper admitted that there "could be" many reasons why Maura had appeared nervous.

[11]See Hartwig, Granhag, Stromwall, & Vrij, Police Officers' Lie Detection Accuracy: Interrogating Freely Versus Observing Video, 7 Police Q. 429, 452 (2004) (where officers conducted interrogations of college students acting as suspects in mock crime, "the lie detection accuracy level obtained by the

"catch[ing a person] in some lies" may permit a reasonable inference that a witness is lying, but this requires that the questioning reveal that the witness has contradicted proven facts or has offered information so implausible that it cannot be true. The trooper understood this well enough to offer an example of the type of questioning at someone's front door that might permit him to determine whether that person was lying.[12] Here, however, the trooper conducted no comparable "cross-examination" of Maura. He simply explained his reason for being there, told her that he believed the defendant was present despite her insistence that he was not, and entered. He identified no statement she made that contradicted a known fact, and the only statement he found implausible was her assertion that he was not in the residence.[13]

Hearing the sound of "movement" in the apartment, which the trooper understood to mean that someone other than Maura and Daisy was in the apartment, potentially could have been

police officers was mediocre"); Kassin & Fong, "I'm Innocent!": Effects of Training on Judgments of Truth and Deception in the Interrogation Room, 23 Law & Hum. Behav. 499, 499 (1999) (finding that observers were generally unable to distinguish between truthful and deceptive suspects); Kassin, Meissner, & Norwick, "I'd Know a False Confession if I Saw One": A Comparative Study of College Students and Police Investigators, 29 Law & Hum. Behav. 211, 221 (2005) ("police were less accurate than lay people at judging whether confessions were true or false"); Minzner, Detecting Lies Using Demeanor, Bias, and Context, 29 Cardozo L. Rev. 2557, 2561-2563 (2008) (review of social science research reveals that "legal commentators have generally accepted the view that 'psychological studies strongly indicate that observers do no better than pure chance in evaluating live witnesses,'" and noting that, "[w]hile some studies show that law enforcement officers outperform civilians, the results are mixed at best"); Porter, Woodworth, & Birt, Truth, Lies, and Videotape: An Investigation of the Ability of Federal Parole Officers to Detect Deception, 24 Law & Hum. Behav. 643, 647, 655 (2000) (baseline ability of Canadian Federal parole officers to detect deception "was significantly below level of chance").

[12]The trooper, after he said, "Catch them in some lies," offered this example: "I've caught people saying, 'He went to work.' 'Well, his vehicle's still here. How did he get to work?' 'Well, a friend picked him up.' 'What's his friend's name?' 'I don't know his friend's name.' 'Can you call him on the cell phone?' 'He doesn't have the phone.' Things of that nature that just lead us to believe that the woman or person isn't telling the truth."

[13]We do not decide here whether, after "cross-examination" of the person who answers the door, a police officer's determination that someone had lied about the absence from the home of the subject of the arrest warrant would be sufficient alone to constitute reasonable cause justifying entry into the home.

enough to support a reasonable belief that the movement came from the defendant if the trooper had previously ascertained that only three persons resided in the apartment or if Maura had denied that anyone else was in the apartment. But the trooper had no information as to how many persons resided there and never asked Maura whether anyone other than she and her daughter were at home. See *United States* v. *Hill*, 649 F.3d 258, 264 (4th Cir. 2011) ("noise coming from inside of a house is not enough to give the police a reason to believe that a defendant is present"). Nor did he testify that the sound of movement came from the bedroom where he thought Maura had been looking. In fact, the trooper admitted he did not know who made the noise.[14] It is perhaps for this reason that, when asked the basis for what he characterized as his "reasonable suspicion," the trooper mentioned only Maura's nervousness, her looking back toward the bedroom, and his experience in executing arrest warrants, not the "movement" he heard in the apartment.

Where the police have a reasonable belief that the subject of an arrest warrant resides in the home and is present in the home, the arrest warrant alone is enough to justify the search of the subject's home for the purpose of arresting him. *Payton* v. *New York*, 445 U.S. at 602-603 ("If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law"). But where there is not such a reasonable belief, the entry into the home is unreasonable and in violation of the Fourth Amendment and art. 14 because the only constitutional justification for the entry is the arrest of the subject of the warrant. The require-

---

[14]Detective Wolferseder testified that Trooper Napolitano "made mention of a sound coming from the room where the female had just stepped out from," but the judge did not indicate that he credited his testimony, and we therefore do not consider it. If we were to consider it, we would also need to consider the detective's testimony that the trooper and he stood outside the door for "seconds" before they entered the apartment (without consent), and that they were already in the kitchen of the residence when the trooper said that he heard the sound in the bedroom. Even if we were to consider the detective's testimony, it would not support the reasonableness of the entry because, according to him, the entry had already occurred, and he and the trooper were in the kitchen when the trooper said that he heard the sound coming from the bedroom.

ment of reasonable belief, therefore, protects not only the subject of the warrant but *all* residents of the home from the needless invasion of the sanctity of their home. See *Payton* v. *New York, supra* at 588-589, quoting *United States* v. *Reed,* 572 F.2d 412, 423 (2d Cir.), cert. denied sub nom. *Goldsmith* v. *United States,* 439 U.S. 913 (1978) ("To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home"). The "physical *entry* of the home is the chief evil against which the wording of the Fourth Amendment is directed" (emphasis in original). *Commonwealth* v. *Lopez,* 458 Mass. 383, 389-390 (2010), quoting *United States* v. *United States Dist. Court for the E. Dist. of Mich.,* 407 U.S. 297, 313 (1972). "In the home, . . . *all details are intimate details, because the entire area is held safe from prying government eyes*" (emphasis in original). *Lopez, supra* at 390, quoting *Kyllo* v. *United States,* 533 U.S. 27, 37 (2001). If evidence as meager as is present here were sufficient to support a finding of reasonable belief that the subject of the warrant was inside the home, the standard would be so debased that it would provide only illusory protection of "the sanctity of the home." Any law enforcement officer could justify entry into a home with an arrest warrant, without having done even the most perfunctory investigative "homework," by contending that he was able without significant questioning to discern that the person who insisted that the subject was not there was lying and that he heard unspecified "movement" inside. The reasonable belief standard is not very demanding, and certainly less demanding than probable cause, but it demands more than what was relied upon here to justify "an invasion of the sanctity of the home."[15]

Having concluded that the entry into the home was not sup-

---

[15]From our review of our appellate case law and the Federal appellate case law, we have found only one case (and the prosecution has cited none) where a court found a reasonable belief on a factual basis as slender as the one here. In *United States* v. *May,* 68 F.3d 515, 516 (D.C. Cir. 1995), the United States Court of Appeals for the District of Columbia found that the police had a reasonable belief that the subject of the arrest warrant was home based solely on the following reasoning:

"The murder occurred on a Saturday afternoon, the warrant issued on Monday, and the police entered the premises on Tuesday morning. [The defendant] slept somewhere on Sunday and Monday. The police reasonably could suppose that the somewhere was the address on the affidavit

ported by a reasonable belief and therefore was unconstitutional, we must now consider whether that unlawful entry so tainted the defendant's subsequent consent to reenter the premises to retrieve the sword and BB gun as to justify suppression of those items. "In determining whether evidence obtained after [a constitutional] violation must be suppressed, the issue is not whether 'but for' the prior illegality the evidence would not have been obtained, but 'whether . . . the evidence . . . has been come at by exploitation of [that] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Commonwealth* v. *Damiano*, 444 Mass. 444, 453 (2005), quoting *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 258 (1982). "[I]nfection will be held to have occurred when the illegality of the police behavior is sufficiently grave and the connection between the illegality and the making of the statements is sufficiently intimate." *Damiano, supra* at 453-454, quoting *Commonwealth* v. *Sylvia*, 380 Mass. 180, 183 (1980). "It is the Commonwealth's burden to establish that the evidence it has obtained and intends to use is sufficiently attenuated from the underlying illegality so as to be purged from its taint." *Damiano, supra* at 454, citing *Commonwealth* v. *Fredette*, 396 Mass. 455, 459 (1985).

The Commonwealth has not met that burden here. The defendant's consent to enter was sought only after the police learned that the firearms and musket they seized during the first entry had been stolen during a burglary in Sterling, and that other items, including the sword and BB gun, had not been recovered. The seizure of the firearms and musket were fruits of the illegal entry, and the connection between the illegality and the granting of consent was "sufficiently intimate" that the consent cannot be found to have been so attenuated from the illegal entry as to be purged from its taint. Therefore, we conclude that the judge

and that [the defendant] would still be inside at 11:20 a.m. when they arrived."

A law review article argued that the application of the facts in this decision "eviscerates the *Payton* [v. *New York*, 445 U.S. 573 (1980),] rule." Edwards, Posner's Pragmatism and *Payton* Home Arrests, 77 Wash. L. Rev. 299, 350 (2002). We note that, in the instant case, the Commonwealth correctly did not contend that the time of the entry (approximately 9:30 A.M. on a weekday) supported a finding of reasonable belief.

erred in denying the motion to suppress, and that evidence of the sword and the BB gun should have been suppressed. Because these were the only stolen items that the jury found the defendant to have illegally received, the convictions of receipt of stolen property must be vacated. Because the Commonwealth cannot retry the defendant on these indictments without such evidence, we remand the case to the Superior Court for entry of an order of dismissal as to both indictments.

*Conclusion.* For the reasons stated, the judge's denial of the motion to suppress is reversed, the convictions of receipt of stolen property are vacated, and the case is remanded to the Superior Court for entry of an order of dismissal of these indictments.

*So ordered.*