NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

16-P-1542                                    Appeals Court


COMMONWEALTH  vs.  STANLEY FREDERICQ.[1]


No. 16-P-1542.

Plymouth.     December 1, 2017. - March 12, 2018.

Present:  Agnes, Blake, & McDonough, JJ.


Cellular Telephone.  Controlled Substances.  Constitutional Law,
     Search and seizure, Standing, Privacy, Probable cause.
     Search and Seizure, Consent, Expectation of privacy, Fruits
     of illegal search, Multiple occupancy building, Probable
     cause, Warrant.  Privacy.  Probable Cause.  Consent.
     Evidence, Result of illegal search, Business record.
     Practice, Criminal, Motion to suppress, Standing, Warrant.




     Indictments found and returned in the Superior Court
Department on August 22, 2008.

     A pretrial motion to suppress evidence was heard by Thomas
J. McGuire, Jr., J.

     An application for leave to prosecute an interlocutory
appeal was allowed by Barbara A. Lenk, J., in the Supreme
Judicial Court for the county of Suffolk, and the appeal was
reported by her to the Appeals Court.


_____

     [1] In conformity with our practice, we spell the defendant's
name as it appears in the indictment.

Nathaniel Kennedy, Assistant District Attorney, for the Commonwealth.
Jason Benzaken for the defendant.

BLAKE, J.  As a result of information gathered in connection with a homicide, an interstate narcotics investigation began, which led police to discover cocaine and cash at 220-222 Howard Street in the city of Brockton.[2]  This is an interlocutory appeal by the Commonwealth from the order allowing the defendant's motion to suppress evidence obtained as a result of a warrantless search.  We reverse in part and affirm in part.

We set forth detailed facts and the procedural history of this case as they are necessary to the analysis.  The defendant was indicted for trafficking in two hundred grams or more of cocaine.  He has twice filed motions to suppress.  In his first motion, the defendant argued that the search at 220 Howard Street was conducted without a warrant and without his consent.  After a two-day evidentiary hearing, the first motion judge denied the motion on grounds that the defendant consented to the search.  In the defendant's second, or so-called "amended" motion to suppress, he argued that the evidence seized from 220

---

[2] The building at this location consists of a multifamily dwelling and has an address of 220-222 Howard Street, with the numbers denoting two different doors at the front of the residence.  Because the witnesses primarily referred to the building as 220 Howard Street, we will do so here.

Howard Street must be suppressed as the tainted fruit of the unlawfully obtained cellular site location information (CSLI).[3] The same judge denied the motion after a nonevidentiary hearing and the defendant sought interlocutory review.

A single justice of the Supreme Judicial Court, while retaining jurisdiction of the case, ordered an evidentiary hearing on the motion.  After the evidentiary hearing, a second motion judge denied the motion, concluding that the defendant lacked standing as he had no reasonable expectation of privacy in the cellular telephone.  Following receipt of the trial court decision and the issuance of several appellate decisions involving the police use of CSLI, the single justice again remanded the case to for further consideration in light of Commonwealth v. Augustine, 467 Mass. 230 (2014), and Commonwealth v. Moody, 466 Mass. 196 (2013), as well as Riley v. California, 134 S. Ct. 2473 (2014).

Thereafter, a third motion judge held a hearing at which no additional evidence was presented, but the transcripts from the

---

[3] CSLI "is a record of a subscriber's cellular telephone's communication with a cellular service provider's base stations (i.e., cell sites or cell towers) . . . ; this identifies the approximate location of the 'active cellular telephone handset within [the cellular service provider's] network based on the handset's communication with a particular cell site.'" Commonwealth v. Estabrook, 472 Mass. 852, 853 n.2 (2015), quoting from Commonwealth v. Augustine, 467 Mass. 230, 238 (2014), S.C., 470 Mass. 837 (2015).  It also identifies the subscriber of the cellular telephone number.

previous hearings were submitted together with additional briefs from the parties. The third motion judge concluded that the defendant had standing. He also reasoned that because the police seized the cocaine "by exploiting the unlawful electronic tracking through CSLI," and because "[t]he search and seizure was not attenuated from the" illegal conduct, the motion must be allowed. The Commonwealth's application for leave to appeal from that order was granted and the case was entered in this court.

Background. The findings of fact made by each of the three motion judges are consistent and are not in dispute on appeal. We summarize the findings relevant to the issues raised in this appeal, supplemented where necessary with undisputed evidence that was implicitly credited by the particular judge ruling on the motion. See Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).

On June 8, 2008, there was a shooting that resulted in the death of Bensney Toussaint. A few days later, on June 10, 2008, police officers obtained an arrest warrant for Josener Dorisca. Dorisca, for all relevant time periods relating to this matter, was a fugitive from justice. On June 26, 2008, an indictment was returned against Dorisca, charging him with murder.

During the homicide investigation, Detective Kenneth Williams of the Brockton police department identified Cassio

Vertil[4] as Dorisca's best friend.  Detective Williams spoke to Cassio; he was not cooperative, but he gave the detective his cellular telephone number.  Detective Williams obtained the cellular telephone records for the number provided by Cassio, which showed that "Bill Desops" was the subscriber.  The records also showed that telephone calls were made within moments of the shooting to a cellular telephone number that police identified as belonging to Dorisca.  Thereafter, Detective Williams spoke to Cassio again, but was unsuccessful in eliciting information about the nature of those telephone calls or Dorisca's location.  During the interview, Detective Williams recognized Cassio from a videotape that he had seen.[5]

As the second judge found, that videotape, recorded several months before the homicide, captured Cassio, "a person named Rinaldi Lauradin, and others flashing large sums of money and discussing the movement of drugs from Florida to Massachusetts." A gun could also be seen in the footage.  Detective Williams testified that "the tape clearly displays [Cassio] and other members engaged in what seems to be very lucrative drug dealings. . . .  And bragging and boasting of going to Florida

---

[4] As Cassio Vertil shares a surname with another witness, his brother, Kennell Vertil, see infra, we use their first names to avoid confusion.

[5] The videotape was admitted in evidence at the suppression hearing.

to obtain more drugs.  And they're flashing tens of thousands of dollars on this tape."

About one month after the homicide, Detective Williams spoke to Cassio's brother, Kennell.  Kennell reported that Cassio was now using a different cellular telephone number, and that Cassio was on his way to New York with "Paco" and "Paquito."  Further investigation revealed that Paco was the defendant and Paquito was Stevenson Allonce.  After speaking with Kennell, the Commonwealth sought and obtained an order pursuant to 18 U.S.C. § 2703(d) (2006) requiring the cellular telephone carrier to provide the records and the so-called "running location" of that different telephone, going forward, to assist in finding Dorisca and to investigate Cassio.[6]  The carrier was required to provide Detective Williams with the cellular telephone's location every fifteen minutes prospectively.  The carrier "pinged" the telephone at fifteen-minute intervals, an action that is not routinely undertaken by

---

[6] The motion, the affidavit, and the § 2703(d) order were admitted as an exhibit at the hearing.  The second motion judge referred in some detail to the facts recited by Detective Williams; however, neither party has included a copy of the exhibit in the record appendix for us to determine whether the judge properly recited the facts therein.  Accordingly, we exercised our discretion and obtained the exhibit sua sponte. See Mass.R.A.P. 9(b), as amended, 378 Mass. 935 (1979); Mass.R.A.P. 18(a), as amended, 425 Mass. 1602 (1997).  Cf. Iverson v. Board of Appeals of Dedham, 14 Mass. App. Ct. 951, 951-952 (1982).

cellular telephone carriers.[7]  The defense expert explained that the "ping" sends a communication signal to the cellular telephone and requires the cellular telephone to communicate with the nearby cell tower.  See generally Commonwealth v. Augustine, 467 Mass. at 237-238.  The carrier can identify the location of the cell tower by coordinates of longitude and latitude.  The carrier then sends, in this case to Detective Williams, this information and the maximum distance the cellular telephone can be from that cell tower, based on the strength and location of nearby cell towers.

The CSLI records showed that the defendant, not Desops, was the subscriber of the cellular telephone that Cassio was then using.  The billing address on those records was 220-222 Howard Street, apartment 2.  The records also reflected that the defendant had yet another cellular telephone number.

State police Trooper Eric Telford assisted in the homicide investigation.  He knocked on doors, spoke to family members,

---

[7] A cellular telephone will regularly send a signal to nearby cell towers or cell sites to insure that service is maintained.  Commonwealth v. Augustine, 467 Mass. at 237-240.  There is a second type of "historical CSLI" identified in Augustine as "registration CSLI" but that type was neither at issue in Augustine, nor is it at issue in this case.  Id. at 238 n.18.  Registration CSLI is created when cellular telephones "regularly identify themselves to the nearest cell site with the strongest signal, through a process known as 'registration.' Registration is automatic, occurring every seven seconds." Ibid.

and tried to obtain information about individuals close to Dorisca.  On the evening of July 2, 2008, Trooper Telford was contacted by a confidential informant.  The informant told Trooper Telford that Cassio was headed to Florida in a brown Toyota RAV4 sport utility vehicle (SUV) rental to pick up a large quantity of narcotics.  As a result, Trooper Telford thought that Dorisca may intend to hide out in Florida.

From July 2 to July 8, 2008, Detective Williams confirmed, through CSLI data, that Cassio, Allonce, and the defendant made a trip to Florida.  The CSLI data also showed that the cellular telephone was traveling south toward Florida and came to a stop in Sunrise, Florida.  When the signal was stationary in Sunrise, Detective Williams contacted the local police.  Using the CSLI data, the Sunrise police found a brown Toyota, with a Massachusetts registration, and through additional surveillance and communication with Massachusetts police, identified Cassio, Allonce, and the defendant as the three individuals using the Toyota.  On July 7, 2008, the CSLI data indicated that the cellular telephone was moving north.  When the telephone was shut off for a period of time during the trip, Detective Williams could not track it.

On July 8, 2008, Detective Williams again began receiving CSLI information as the Toyota approached the Massachusetts

border.  He alerted the Brockton and the Randolph[8] police that the Toyota was returning to the area.  At 2:15 P.M., Detective Williams was notified that the telephone pinged at or near Howard Street.  Trooper Telford and State police Trooper Francis Walls, together with other officers, arrived at 220 Howard Street shortly after this ping was received.

Trooper Telford observed Cassio standing in front of the Howard Street building with an individual who matched Dorisca's description.  He watched Cassio and the other individual get into the Toyota and drive away.  Troopers Telford and Walls followed.  When the driver made a left turn without using a directional signal, the troopers stopped the Toyota.  The driver was identified as Cassio and the passenger was identified as Allonce, not Dorisca.  The two stated that the defendant had been traveling with them, that they had just come from his house, and that they were going to the Brockton police department to speak to Detective Williams about the homicide. The Toyota was filled with clothing, luggage, a pillow, a cooler, and other items.  Trooper Telford had the two occupants step out of the Toyota so they could check for Dorisca.  When Trooper Telford confirmed Dorisca was not hiding in the Toyota, he permitted Cassio and Allonce to continue on their way.  Ping

---

[8] Cassio lived in Randolph.

data that Detective Williams received showed that the cellular telephone came to rest near the Brockton police station at about 3:45 P.M. on July 8, 2008.

Troopers Telford and Walls returned to 220 Howard Street to look for Dorisca, to find and speak to the defendant, and to investigate the possible drug connection to the property. Trooper Telford directed other officers to that location to assist him. When Troopers Telford, Walls, and Jackson arrived, they approached a man on the front porch. As Trooper Walls began to speak to him, a female and a male came out of the first-floor apartment. While Trooper Telford walked around to the rear of the house, Trooper Walls explained to the couple that the police were looking for a homicide suspect and that they thought that he might be inside their apartment. The couple agreed to allow both troopers inside and walked them through every room of their apartment. The troopers were taken through the back door to the exit, which opened into a common rear entry area. There was a door to the outside from that common area, as well as stairs to the second and third floors.

Troopers Walls and Jackson used the rear stairs to go to the second-floor apartment, where the occupant of that apartment met them in the hallway. They repeated their request and were again granted permission to look for Dorisca in that apartment. Finding nothing, both troopers continued to the attic. At the

top of the stairs there was a large open landing area, without any door. Off of the landing area, there were four doors, which led to two bedrooms, a storage area, and a crawl space. The only way to secure the attic would be to lock the entry door located in the common area on the first floor. Three of the four doors in the attic were open and the troopers looked in each space. A television was in the front bedroom, and junk was piled in the storage room. There was no bathroom or shower on this floor.

The troopers knocked on the closed, fourth door several times before the defendant opened it and came into the landing area. They asked the defendant his name and, when he told them, they asked if he had a nickname; he said it was Paco. Because Trooper Walls knew Paco was a name related to the drug investigation Trooper Telford was working on, he contacted Trooper Telford and asked him to come up to the attic. In the meantime, Troopers Jackson and Walls explained that they were looking for Dorisca. They obtained the defendant's verbal permission to do a quick walk-through of the defendant's room, which turned up nothing significant. The defendant said he lived there and was paying $400 in rent per month.

Trooper Telford, who had been outside, walked through the rear entry door to the common hallway and came up the back stairs to the attic. Trooper Telford read the defendant his

Miranda rights and explained to him why the troopers were there. The defendant said that he had gone to Florida with his friends to attend a family reunion for Allonce. The defendant denied having any drugs in his room and signed a consent to search form.

During the subsequent search, police found about $2,200 in a cupboard in the defendant's bedroom. After a narcotics-trained dog arrived in the attic, police located a pillowcase in the crawl space that contained about two kilograms of what police believed to be cocaine. That pillowcase matched a pillowcase found in the Toyota. The defendant denied any knowledge of the contraband.

Based on this evidence, the third motion judge ruled that the defendant had standing to challenge the search because the tracking continued while the police searched 220 Howard Street. The judge also determined that the defendant's reasonable expectation of privacy under art. 14 of the Massachusetts Declaration of Rights was violated where the police tracked his "movements for seven days through the collection of CSLI obtained from a cell phone registered to him but used by [another]." With respect to the search, the judge agreed with the Commonwealth that no warrant was required to obtain subscriber information from the carrier. However, the judge determined that under Commonwealth v. Augustine, 467 Mass. at

257, the failure of the Commonwealth to acquire a warrant for the CSLI rendered that evidence illegally obtained. The judge found that because the police learned, only through the unlawful CSLI, that the cocaine was likely brought to Howard Street, their seizure of the cocaine was the result of "exploiting the unlawful electronic tracking through CSLI." The judge further found that "[t]he search and seizure was not attenuated" from the illegality and thus "[t]he evidence obtained during that search must therefore be suppressed."

Discussion. In reviewing a judge's ruling on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.'" Commonwealth v. Scott, 440 Mass. 642, 646 (2004), quoting from Commonwealth v. Jimenez, 438 Mass. 213, 218 (2002).

1. Standing. On appeal, the Commonwealth does not dispute that the CSLI was illegally obtained. Rather, the Commonwealth argues that the defendant does not have standing to challenge the search of the cellular telephone.

Where a defendant claims the search of the cellular telephone violated his rights under art. 14 and the Fourth and Fourteenth Amendments to the United States Constitution, we must determine initially whether the defendant has "standing to contest the search and then whether [he] had an expectation of

privacy in the area searched." Commonwealth v. Williams, 453 Mass. 203, 207-208 (2009). "Although the two concepts are interrelated, we consider them separately. . . . A defendant has standing either if [he] has a possessory interest in the place searched or in the property seized or if [he] was present when the search occurred." Id. at 208. Here, regardless of whether the defendant allowed Cassio to use the cellular telephone, because the defendant was the registered owner of the telephone and the billing address was his, he had a possessory interest in the telephone sufficient to grant him automatic standing. He also had actual standing because his movements were being tracked when the telephone was pinged by the carrier during the trip he took with Cassio to Florida.

There also was a search in the constitutional sense. The defendant has a reasonable expectation not to be subjected to extended CSLI tracking by the government, even if he is merely a passenger in a vehicle controlled by the primary suspect. The government's monitoring of the defendant's movements -- for more than six days -- is sufficient to establish that he has standing to challenge the validity of the search of the cellular telephone. Commonwealth v. Rousseau, 465 Mass. 372, 382 (2013).[9]

---

[9] The second motion judge, who denied the suppression motion on grounds that the defendant lacked standing because he had no reasonable expectation of privacy in the cellular telephone, did not have the benefit of Rousseau which was subsequently decided.

2. Exclusionary rule. The Commonwealth argues alternatively, that the CSLI information was so attenuated from the seizure of the inculpatory evidence that suppression is not required. Specifically, the Commonwealth argues that the evidence subsequently seized from the Howard Street attic ought not to be excluded because it is too attenuated from the illegality. The Commonwealth's concession is based on Augustine, where the court held that government-compelled production of CSLI data by cellular telephone carriers is a search in the constitutional sense, requiring a warrant under art. 14. 467 Mass. at 252-255.

We pause to note that the CSLI ordered to be produced in Augustine involved historical CSLI, which was generated from telephone calls already made to or from the cellular telephone in question. The related records, which show the cell towers from which connection to telephone calls were made, and through which the locus of the cellular telephone's location can be pinpointed, are maintained by the carrier in the ordinary course of business. Id. at 239-240 & n.24. The § 2703(d) order obtained in this case required the carrier to create CSLI that was not routinely created or retained. That is, the carrier was

Rousseau addressed, for the first time, privacy expectations of a passenger in a motor vehicle when the driver is being monitored by the government.

required to prospectively ping a cellular telephone every fifteen minutes for more than six days, solely for the purpose of finding and providing location information for the police. There is no question that under the rationale of Augustine, a warrant was also required in this case, where the carrier not only was compelled to turn over CSLI data, but to create particular prospective CSLI that it otherwise would not have created. See id. at 240 n.24 ("The privacy interest raised by historical CSLI may be the same as prospective, or 'real-time,' CSLI").

Because a warrant for the particular evidence from the cellular telephone registered to the defendant was required but not obtained, the "crucial question" regarding whether the evidence must be suppressed as tainted fruit is whether it came "by exploitation of . . . [the illegal search] or instead by means sufficiently distinguishable to be purged of the primary taint." Commonwealth v. Estabrook, 472 Mass. 852, 860 (2015) (citation omitted). See Commonwealth v. Bradshaw, 385 Mass. 244, 258 (1982), citing Wong Sun v. United States, 371 U.S. 471, 488 (1963). Relying on these principles, we consider the evidence at issue.

In this case, the troopers first spoke to the defendant when he responded to their repeated knocking by opening the only

closed door in the attic and entering the landing area.[10]  After the defendant gave permission to Troopers Walls and Jackson to do a quick walk-through of his room for Dorisca, Trooper Telford arrived and spoke to the defendant.  He read the defendant his Miranda rights and then "explained to him that [they] were there searching for [Dorisca], who was a homicide suspect, and that [they] also had information that he, and Mr. Azario [sic], and the other defendant there, Allonce, had just gone down to Florida and purchased a large amount of narcotics and they were possibly storing it there."  This statement was based directly on the tainted CSLI and while it was intertwined with other

---

[10] Contrary to the defendant's claim on appeal, the arrival of the police at 220 Howard Street did not result from exploiting the CSLI.  Troopers Telford and Walls had stopped the Toyota when it failed to signal before turning.  Regardless of whether the police were in a position to observe the traffic infraction because of the illegally obtained CSLI, "the stop is valid 'so long as the police are doing no more than they are legally permitted and objectively authorized to do.'" Commonwealth v. Santana, 420 Mass. 205, 209 (1995) (citation omitted).  See Commonwealth v. Buckley, 478 Mass. 861, 866-867 (2018) (Examining "police's underlying motives for conducting the stop" would "require that courts discern not only whether the police initially possessed some underlying motive that failed to align with the legal justification for their actions, but also whether the police were acting on that 'improper' motive").  Here, the police observed a traffic infraction and were permitted to stop the vehicle.  See Commonwealth v. Bacon, 381 Mass. 642, 644 (1980).

The police established a sound basis to return to 220 Howard Street to speak with the defendant once they identified Cassio and Allonce in the Toyota, and Cassio confirmed the information independently acquired from the CSLI.

independent evidence, the inquiry exploited the improperly obtained CSLI.  Commonwealth v. Estabrook, supra at 864-865.

Specifically, the police knew from a somewhat dated videotape that existed prior to the CSLI that Cassio had traveled to Florida to buy large amounts of narcotics.  In addition, they had statements from Kennell that Cassio was traveling to New York with the defendant and Allonce.  They also had statements from an informant (who Trooper Telford had not previously used) that Cassio (without reference to any other individuals) was going to Florida to buy narcotics in a brown Toyota.  They also knew from Kennell that Cassio was using a cellular telephone number that was registered to the defendant and was billed to 220 Howard Street.  The CSLI, however, provided the only direct and reliable evidence that the defendant had "just" participated in a trip to Florida.  Indeed, Massachusetts authorities used the CSLI to direct police in Sunrise, Florida, to the location where the cellular telephone came to rest, and from where, through surveillance, identification details from the Toyota and its occupants were relayed back.

The Commonwealth argues that the defendant's statements and the subsequent discovery of the evidence are admissible because they were attenuated from the initial illegal search of the CSLI.  We disagree for the reasons stated in Commonwealth v.

Estabrook, supra.  The defendant was not confronted with any question based on his CSLI until he spoke with Trooper Telford, after the defendant answered the knock on his attic room door. Indeed, when Trooper Telford confronted the defendant with evidence of this tainted CSLI, including that the information that the defendant had just returned from Florida, there is no evidence that the defendant was aware that the police knew he had traveled to Florida.  Insofar as the defendant is concerned, his statement and his consent to search, given "in direct response to confrontation with evidence of his CSLI[,] were made in close proximity to the illegality, and there were no intervening circumstances between the police questions based on the CSLI and [the defendant's] responses thereto."[11]  Ibid.  The defendant's statements therefore must be suppressed.  "[T]he connection between the illegality and the granting of consent was 'sufficiently intimate' that the consent cannot be found to have been so attenuated from the [exploitation of the CSLI] as to be purged from its taint."  Commonwealth v. Gentile, 466 Mass. 817, 831 (2014).

---

[11] Although the third motion judge did not specifically reference the defendant's statements when he ordered suppression of the evidence obtained during the search, he concluded by allowing "[t]he defendant's Amended Motion to Suppress Evidence II," which included a request to suppress the defendant's statements.

As for the cash found in the cupboard in the defendant's bedroom, there is certainly some question that the defendant was not being truthful when he said the room was his home, particularly given the lack of a bathroom or a shower. Nonetheless, the defendant kept it locked and he was inside when the police arrived. For the reasons discussed supra, we conclude that the defendant's consent to search was tainted by the police exploitation of the illegally obtained CSLI and therefore, his statement to police before the search and the cash found in his bedroom must be suppressed.

With respect to the search of the crawl space, however, the defendant's consent was not required. The facts regarding the access to, use, and layout of the attic were carefully developed during the evidentiary hearings. The crawl space was accessible to any tenant by entering through the ground level exterior door in the rear of the dwelling, which was apparently left unlocked, and walking up the stairs to the attic. There, off of the main landing, were several rooms or areas with open doors, including the crawl space. Items found in the rooms with open doors suggested that tenants stored or disposed of possessions they did not need or want in that location. The cocaine was found in a pillowcase in that attic crawl space. Because the crawl space was within this common area in a multiunit building, there is no reasonable expectation of privacy in items left there. See

Commonwealth v. Thomas, 358 Mass. 771, 774-775 (1971);

Commonwealth v. Montanez, 410 Mass. 290, 302 (1991);

Commonwealth v. Holley, 79 Mass. App. Ct. 542, 551-552 (2011).

See also Commonwealth v. Connolly, 356 Mass. 617, 624, cert.

denied, 400 U.S. 843 (1970) ("Since the basement was a common

area freely available to all the tenants, one tenant could give

permission to its search"). As a matter of law, the police were

permitted to search the crawl space without the defendant's

consent and without a warrant. See, e.g., Commonwealth v.

Williams, 453 Mass. at 209 (Because defendant had no reasonable

expectation of privacy in space searched, he "cannot challenge

the police action that occurred there"). The cocaine therefore,

need not be suppressed.

We address one outstanding issue. When this case was

remanded in 2015 by the single justice, it was with the

instruction to consider the defendant's motion to suppress in

light of several recently decided cases, specifically

Commonwealth v. Augustine. Despite this instruction, neither

the Commonwealth nor the third motion judge addressed that

portion of Augustine in which the court considered whether the

§ 2703(d) application provided probable cause to obtain the CSLI

and, if so, the failure to seek a warrant to obtain CSLI would

not require suppression of that evidence. 467 Mass. at 255-256.

Nor did the Commonwealth raise the issue in its brief on appeal,

although the matter was briefly touched on at oral argument, over the defendant's objection. Because of the lengthy and somewhat unusual procedural posture of this case and the specific instruction from the single justice to consider Augustine, we address the issue in the interest of judicial economy. See Commonwealth v. Beale, 434 Mass. 1024, 1024 n.1 (2001).

Here, the only detailed statement in Detective Williams's affidavit accompanying the § 2703(d) application for the CSLI reads: "The current and recent location of Cassio Vertil is necessary and important to my investigation because other witnesses and obtained phone records indicate that Cassio Vertil has been, and continues to provide aid and support to the indicted Josener Dorisca." The statement fails to identify the witnesses and does not identify the requisite basis for assessing their reliability or their veracity. See Commonwealth v. Burt, 393 Mass. 703, 710 (1985) (discussing various kinds of informers and witnesses). Similarly, the particular "phone records" are not identified and Detective Williams did not articulate how those records reveal that Cassio provided aid and support to Dorisca. Contrast, e.g., Commonwealth v. Lopes, 455 Mass. 147, 164-165 (2009). This conclusory statement is so bereft of the factual details required to establish probable cause that, unlike the situation presented in Augustine, we need

not remand the matter to the trial court for further findings. See, e.g., Commonwealth v. Moran, 353 Mass. 166, 169-170 (1967) (distinguishing between facts and conclusions).

Conclusion.  So much of the order as allowed the defendant's motion to suppress with respect to the cocaine is reversed.  In all other respects, the order is affirmed.

So ordered.