NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12572

COMMONWEALTH  vs.  STANLEY FREDERICQ.[1]


Plymouth.     November 5, 2018. - April 24, 2019.

Present:  Gants, C.J., Lowy, Budd, Cypher, & Kafker, JJ.


Cellular Telephone.  Controlled Substances.  Constitutional Law,
     Search and seizure, Standing to question constitutionality,
     Privacy.  Privacy.  Search and Seizure, Expectation of
     privacy, Fruits of illegal search, Consent.  Practice,
     Criminal, Motion to suppress, Standing.



Indictments found and returned in the Superior Court
Department on August 22, 2008.

A pretrial motion to suppress evidence was heard by Thomas
J. McGuire, Jr., J.

An application for leave to prosecute an interlocutory
appeal was allowed by Lenk, J., in the Supreme Judicial Court
for the county of Suffolk, and the appeal was reported by her to
the Appeals Court.  After review by the Appeals Court, the
Supreme Judicial Court granted leave to obtain further appellate
review.


Jason Benzaken for the defendant.

---

[1] The defendant's name is spelled in various court documents
as "Fredericq" or "Frederico."  In accordance with our usual
practice, we will use the spelling as it appears in the
indictment.

Patrick Levin, Committee for Public Counsel Services, for Committee for Public Counsel Services.
Jessica L. Kenny, Assistant District Attorney, for the Commonwealth.

GANTS, C.J.  After the defendant was indicted by a grand jury for trafficking cocaine in violation of G. L. c. 94C, § 32E (b), he moved to suppress the cocaine and cash seized during a warrantless search of his residence on the third floor of a multiunit house, commencing the nearly decade-long procedural journey that brought this case to our doorstep.  The Superior Court judge who last ruled on this motion held that the cocaine and cash must be suppressed, concluding that they were the fruits of the unlawful police tracking of a cellular telephone through which the police obtained cell site location information (CLSI) without a search warrant based on probable cause.[2]

We conclude that the defendant has standing to challenge the Commonwealth's warrantless CSLI search because, by monitoring the telephone's CSLI, the police effectively

---

[2] The term "CSLI" refers to "a cellular telephone service record or records that contain information identifying the base station towers and sectors that receive transmissions from a [cellular] telephone" (quotations and citation omitted). Commonwealth v. Augustine, 467 Mass. 230, 231 n.1 (2014), S.C., 470 Mass. 837 (2015) and 472 Mass. 448 (2015).  It may be used to identify the approximate location of the cellular telephone based on the telephone's communication with a particular cell site.  See id. at 238.

monitored the movement of a vehicle in which he was a passenger. We further conclude that, under the circumstances here, the seizure of the cocaine and cash was the direct result of information obtained from the illegal CSLI search; that, under the fruit of the poisonous tree doctrine of the exclusionary rule, it is irrelevant whether the defendant had a reasonable expectation of privacy in the crawl space where the cocaine was found; and that the Commonwealth has failed to meet its burden of proving that the seizure was sufficiently attenuated from the illegal search such that it should not be deemed a forbidden fruit of the poisonous tree.  Specifically, we conclude that the defendant's consent to a search of his residence did not purge the seizure from the taint of the illegal CSLI search, where the consent was obtained through the use of information obtained from that search.  For these reasons and as discussed more fully infra, we affirm the order granting the defendant's motion to suppress.[3]

Background.  The complex procedural history of this case is ably described in the Appeals Court opinion.  Commonwealth v. Fredericq, 93 Mass. App. Ct. 19, 20-26 (2018).  Suffice it to say that the defendant's motion to suppress was initially denied by one Superior Court judge, remanded by a single justice of the

---

[3] We acknowledge the amicus brief submitted by the Committee for Public Counsel Services.

county court for an evidentiary hearing, denied again by another motion judge, remanded again by the single justice, and allowed by a third motion judge.

We summarize the facts as found by the third motion judge, who relied on the facts found by the first two motion judges at the prior evidentiary hearings. We accept the judges' subsidiary findings of fact, which we do not find to be clearly erroneous. See Commonwealth v. Scott, 440 Mass. 642, 646 (2004) ("In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error . . ."). Where necessary and appropriate, we supplement these findings with uncontradicted witness testimony that the motion judges implicitly credited. See Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).

On June 26, 2008, a grand jury indicted Josener Dorisca for the murder of Bensney Toussaint, and a warrant issued for Dorisca's arrest. In attempting to locate Dorisca, Detective Kenneth Williams of the Brockton police department spoke with Dorisca's best friend, Cassio Vertil.[4] Cassio admitted that he had spoken with Dorisca within a day of the homicide. After Cassio gave his cellular telephone number to the police, Williams examined records connected to the telephone, which

---

[4] We refer to Cassio and Kennel Vertil by their first names because they share a surname.

confirmed that calls had indeed been made after the shooting to a cellular telephone belonging to Dorisca.

Williams recognized Cassio from a videotape recorded months before the homicide that showed Cassio and another person discussing the movement of drugs from Florida to Massachusetts. Williams testified that "the tape clearly displays [Cassio] . . . engaged in what seems to be very lucrative drug dealings . . . And bragging and boasting of going to Florida to obtain more drugs. And they're flashing tens of thousands of dollars on this tape."

On July 2, 2008, Williams spoke with Cassio's brother, Kennel, who said that Cassio was now using a different cellular telephone and provided Williams with the new telephone number. Kennel also stated that Cassio was traveling to New York in a brown Toyota RAV-4 motor vehicle with individuals nicknamed "Paco" and "Paquito." Williams knew that Paco was the defendant in this case and that Paquito was Stephen Allonce. State troopers also learned from a confidential informant that Cassio was traveling to Florida in the brown Toyota to purchase narcotics. There was little information offered at the hearings regarding the reliability or veracity of this confidential informant. State police Trooper Eric Telford testified that he had not used this informant in the past, but Williams

characterized the informant as "reliable," without explaining the basis of this characterization.

That same day, July 2, the Commonwealth sought and obtained a court order, pursuant to 18 U.S.C. § 2703(d) (2006), to require the cellular service provider to produce records for the cellular telephone that Cassio was now using. Under § 2703(d), a court may order a telephone company to produce records, including CSLI records, "if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the . . . records or other information sought . . . are relevant and material to an ongoing criminal investigation." In addition to subscriber information, the court order required, for the period from July 1 through July 6 (later extended to July 8), the production of records of cell sites utilized for telephone calls, toll records for calls made or received, and "updates on the phone's location every fifteen . . . minutes."

On July 2, the cellular service provider furnished Williams with records showing that the defendant was the subscriber for this cellular telephone, and that the defendant resided in an apartment in Brockton (residence). The cellular service provider used "ping" technology to send radio signals to the cellular phone and record the approximate location of the cell sites or cell towers with which the telephone communicated, and

sent the resulting CSLI records by e-mail to Williams.  Those records indicated that the telephone had traveled south from Randolph and eventually had come to a stop in Sunrise, Florida.

Williams then requested the assistance of the local police in Florida, who used the CSLI data to track down the brown Toyota vehicle and observed Cassio, the defendant, and Allonce staying together at a motel.  The local police did not identify any of the men as Dorisca.

On July 7, 2008, the CSLI records indicated that the cellular telephone was traveling north toward Massachusetts.  In response, the police began surveillance at the defendant's residence and also at Cassio's home in Randolph.  At approximately 2:15 P.M. on July 8, the police observed the brown Toyota vehicle parked at the defendant's residence and saw Cassio standing outside with another person who appeared to match the description of Dorisca.  Cassio then drove away in the vehicle with Allonce as a passenger.  Two State police troopers followed them and stopped the vehicle after it had traveled a few blocks; they observed that the vehicle contained clothing, luggage, and a cooler.  Cassio told the troopers that he had just left Paco's house and was heading to the police station in Brockton to meet with Williams regarding the homicide.  Cassio and Allonce then drove to the Brockton police station; the last report of the cellular service provider regarding the cellular

telephone's location at approximately 3:47 P.M. that day indicated that the telephone was located inside the vehicle at the Brockton police station.

The State police troopers returned to the residence to look for Dorisca and speak to the defendant. After approaching the building, they encountered two residents of the first-floor apartment. The troopers stated that they were looking for a homicide suspect, and the residents consented to a search of their unit. After the troopers looked through the unit, they left through a back door into a rear entry area and walked up the stairs to the second floor. The resident of that unit also consented to a search of her unit. The troopers then continued up the rear stairway to the third floor, which led to an open landing area with several doors that led to two bedrooms, a storage area, and a crawl space. All but one of the doors were open.

The troopers knocked on the closed door and the defendant answered, identifying himself as "Paco." He stated that he resided in one of the third-floor bedrooms and paid $400 per month in rent to use that space. Trooper Francis Walls informed the defendant that police were investigating a homicide and that the murder suspect might be in the building. He also said that the investigation involved illegal narcotics.

Telford advised the defendant of his Miranda rights and explained that they were looking for a homicide suspect, and had information that the defendant "had just gone down to Florida and purchased a large amount of narcotics and . . . [was] possibly storing it there." The defendant said that he had just driven back from Florida with some friends, denied possessing drugs, and signed a form giving his consent for a search. During that search, the police found $2,200 in cash in the defendant's bedroom and, after the arrival of a narcotics-trained dog, a pillowcase in the attic crawl space across from the defendant's bedroom containing two "bricks" of cocaine. After the defendant was indicted, he moved to suppress the fruits of the search.

The third motion judge determined that the defendant had standing to challenge the CSLI tracking of the cellular telephone because, although the telephone was used by Cassio, the police knew that the defendant was traveling with Cassio, and "[t]hey intended to track the movements of all three occupants of the vehicle because they had information that the purpose of the trip was to obtain cocaine for distribution in Massachusetts." The judge also concluded that the cocaine seized during the search of the defendant's residence "was found as a result of the unlawful electronic tracking," and "[t]he search and seizure was not attenuated from the unlawful tracking

by lapse of time, intervening circumstances or by another legitimate police purpose in conducting the search." The judge therefore ruled that the evidence obtained during the search must be suppressed as "fruit of the poisonous tree."

A single justice of this court granted the Commonwealth's motion for an interlocutory appeal and reported the appeal to the Appeals Court pursuant to Mass. R. Crim. P. 15 (a) (2), as appearing in 422 Mass. 1501 (1996). The Appeals Court agreed with the motion judge's conclusions on both standing and attenuation, but ultimately held that the warrantless search of the crawl space where the cocaine was found was permissible because the defendant had no reasonable expectation of privacy in that area. Fredericq, 93 Mass. App. Ct. at 30-31. On this ground alone, the Appeals Court reversed the allowance of the motion to suppress with respect to the cocaine, and affirmed it in all other respects. Id. at 32. We granted the defendant's motion for further appellate review.

Discussion. In reviewing a judge's decision on a motion to suppress, we "make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." Scott, 440 Mass. at 646.

The police may obtain subscriber information and toll records pursuant to a court order issued under 18 U.S.C. § 2703(d), but under art. 14 of the Massachusetts Declaration of

Rights, the police may not use CSLI for more than six hours to track the location of a cellular telephone unless authorized by a search warrant based on probable cause.[5]  See Commonwealth v. Estabrook, 472 Mass. 852, 858 (2015); Commonwealth v. Augustine, 467 Mass. 230, 254-255 (2014), S.C., 470 Mass. 837 (2015) and 472 Mass. 448 (2015).  See also Carpenter v. United States, 138 S. Ct. 2206, 2220 (2018) (government acquisition of CSLI records constitutes "a search within the meaning of the Fourth Amendment [to the United States Constitution]").  The Commonwealth concedes that the CSLI tracking of the cellular telephone in this case was unlawful because it was not authorized by a search warrant.  But the Commonwealth argues that the motion to suppress should nonetheless have been denied because (1) the defendant had no standing to challenge the tracking of a cellular telephone that was registered in his name, but used solely by Cassio; (2) as the Appeals Court concluded, the cocaine was not seized during a constitutional search because the defendant lacked any expectation of privacy in the crawl space where it was found; and (3) the evidence obtained during the search was sufficiently attenuated from the illegal tracking

---

[5] Article 14 of the Massachusetts Declaration of Rights states in relevant part:  "Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions."

because of the defendant's consent to the search, thus "purging" the search of its taint.  We will discuss these issues in turn.

1.  Standing.  A defendant has standing to challenge a search and seizure under art. 14 if he or she "has a possessory interest in the place searched or in the property seized or if [he or she] was present when the search occurred."  Commonwealth v. Williams, 453 Mass. 203, 208 (2009).  Here, the defendant was the subscriber of the cellular telephone, but the third motion judge found that Cassio was the person who was using that telephone.  The defendant claims that he has standing on three separate and distinct grounds:  first, because he was a passenger in the vehicle whose location was being tracked through the CSLI monitoring of the cellular telephone; second, because he was the registered owner of the telephone, and therefore had a reasonable expectation of privacy in the location of that telephone; and third, because he had a property interest in the telephone that was interfered with when the police pinged the telephone, thereby drawing power from its battery.  We need not address whether the second and third grounds independently would suffice to grant standing, because we conclude that the defendant has standing as a passenger of the vehicle whose location was effectively being continually tracked through CSLI monitoring of the target telephone.

In Commonwealth v. Rousseau, 465 Mass. 372, 382 (2013), we declared that "under art. 14, a person may reasonably expect not to be subjected to extended [global positioning system (GPS)] electronic surveillance by the government, targeted at his movements, without judicial oversight and a showing of probable cause."  We thus held that a passenger with no possessory interest in a vehicle has standing to challenge the extended GPS surveillance of the vehicle as an invasion of his or her own reasonable expectation of privacy.  Id.  See United States v. Jones, 565 U.S. 400, 415-416 (2012) (Sotomayor, J., concurring) ("GPS monitoring generates a precise, comprehensive record of a person's public movements . . . [and] evades the ordinary checks that constrain abusive law enforcement practices."); Commonwealth v. Connolly, 454 Mass. 808, 833 (2009) (Gants, J., concurring) ("the appropriate constitutional concern is not the protection of property but rather the protection of the reasonable expectation of privacy").

With respect to the defendant's reasonable expectation of privacy, the CSLI tracking of the cellular telephone in this case implicates the same constitutional concerns as the GPS surveillance of the vehicle in Rousseau.  See Augustine, 467 Mass. at 254.  Indeed, in Augustine, we noted that the type of prospective CSLI tracking that largely took place here -- as opposed to historical CSLI tracking -- is even more closely akin

to direct GPS surveillance.[6]  Id. at 254 n.36.  The CSLI search was "targeted at [the defendant's] movements," much as the GPS search was targeted at the passenger defendant in Rousseau, because the police knew when they obtained the § 2703(d) order that the defendant was traveling out of State with Cassio in the same vehicle.  Rousseau, 465 Mass. at 382.  They then sought and obtained updates on the vehicle's location every fifteen minutes for at least six consecutive days.  For all practical purposes, the CSLI monitoring of the cellular telephone tracked the defendant's location when he was in the vehicle in much the same way as would GPS tracking of that vehicle.  Accordingly, the defendant here has standing to challenge the CSLI search and any resulting fruits of that search.

2.  The search of the crawl space as fruit of the poisonous tree.  Under what has become known as the "fruit of the poisonous tree" doctrine, the exclusionary rule bars the use of evidence derived from an unconstitutional search or seizure.

---

[6] Historical CSLI refers to information that has already been generated when the data are requested.  Augustine, 467 Mass. at 240 n.24.  Prospective CSLI "refers to location data that will be generated sometime after the order authorizing its disclosure."  Id.  Here, the CSLI search was effectively conducted in "real time" because the cellular telephone was being "pinged" every fifteen minutes, and its location, derived from CSLI rather than a global positioning system in the cellular telephone itself, was being timely reported by the cellular service provider to the police who were conducting the surveillance.

See Wong Sun v. United States, 371 U.S. 471, 487-488 (1963) (defining "fruit of the poisonous tree" as evidence that "has been come at by exploitation of" unlawful search or seizure); Commonwealth v. Damiano, 444 Mass. 444, 453 (2005).  In determining whether evidence derived from an illegal search or seizure must be suppressed, "the issue is not whether 'but for' the prior illegality the evidence would not have been obtained, but 'whether . . . the evidence . . . has been come at by exploitation of [that] illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"  Id., quoting Commonwealth v. Bradshaw, 385 Mass. 244, 258 (1982).  "It is the Commonwealth's burden to establish that the evidence it has obtained and intends to use is sufficiently attenuated from the underlying illegality so as to be purged from its taint."  Damiano, supra at 454.  "[T]he attenuation doctrine is not an exception to the exclusionary rule, but rather a test of its limits."  R.G. Stearns, Massachusetts Criminal Law:  A District Court Prosecutor's Guide 172 (38th ed. 2018).

The Commonwealth contends, and the Appeals Court concluded, see Fredericq, 93 Mass. App. Ct. at 30-31, that the cocaine found in the crawl space should not be suppressed even if it has failed to meet its burden of proving attenuation because the defendant had no reasonable expectation of privacy in the crawl

space. We disagree. Evidence may be suppressed as fruit of the poisonous tree even if it is found in a place where the defendant has no reasonable expectation of privacy. This principle is as old as the fruit of the poisonous tree doctrine itself. In Wong Sun, 371 U.S. at 474, 486-487, the defendant made statements to the police indicating that a codefendant had drugs at his home. The United States Supreme Court held that those statements should have been suppressed because they arose out of an unlawful arrest and that their admission would thus violate the defendant's Fourth Amendment rights. Id. at 484, 486-487. The Court further concluded that the drugs found at the codefendant's home should have been suppressed, even though the defendant did not suggest that he had a reasonable expectation of privacy in the codefendant's home, because the drugs were the fruit of a poisonous tree -- the unlawful arrest. Id. at 487-488. The only relevant factor that the Court considered was whether the police "exploit[ed]" the "illegality" of the unlawful arrest; that alone was sufficient to require the suppression of the drugs. Id. at 488. See id. at 487 ("The prosecutor candidly told the trial court that 'we wouldn't have found those drugs except that [the defendant] helped us to'").

Other courts interpreting the Fourth Amendment have arrived at the same conclusion. See United States v. Olivares-Rangel, 458 F.3d 1104, 1117-1118 (10th Cir. 2006) ("the law imposes no

separate standing requirement regarding the evidence which constitutes the fruit of [the] poisonous tree"); United States v. Green, 275 F.3d 694, 699 (8th Cir. 2001) (although defendant lacked possessory or property interest in searched motor vehicle, "he may still . . . seek to suppress evidence as the fruit of his illegal detention"); Jones v. United States, 168 A.3d 703, 722-723 (D.C. 2017) (defendant's expectation of privacy in another person's purse "not a material consideration in the fruit-of-the-poisonous-tree analysis").  See generally 6 W.R. LaFave, Search and Seizure:  A Treatise on the Fourth Amendment § 11.4, at 325-326 (5th ed. 2012) (LaFave) ("If the defendant does have standing with respect to the poisonous tree, that alone suffices" to challenge admissibility of its fruits).

Nor is the exclusionary rule under art. 14 limited in scope to contraband or evidence seized in a place where the defendant had a reasonable expectation of privacy; art. 14's protection against unreasonable searches and seizures forbids the introduction of all evidence "sufficiently intimate" with those unlawful acts.  See Damiano, 444 Mass. at 453-454, quoting Commonwealth v. Sylvia, 380 Mass. 180, 183 (1980).  For that reason, we have repeatedly held that persons subjected to an illegal seizure were entitled to suppress the fruits of that seizure even where the evidence was discovered in places where it is indisputable that the person in question did not have a

reasonable expectation of privacy. See Commonwealth v. Rodriguez, 456 Mass. 578, 587 (2010) (concluding that even though "[n]o one has a reasonable expectation of privacy in items retrieved from the ground on a public park," evidence of drugs dropped in park could nonetheless be "suppressed as the fruit of an unconstitutional seizure . . . if [a] stop were not supported by reasonable suspicion"). See also Commonwealth v. Warren, 475 Mass. 530, 533, 540 (2016) (vacating denial of motion to suppress where firearm found in yard following unlawful seizure of defendant nearby without reasonable suspicion); Commonwealth v. O'Laughlin, 25 Mass. App. Ct. 998, 998-1000 (1988) (reversing denial of motion to suppress where defendant abandoned jacket containing narcotics in parking garage while being pursued by police without reasonable suspicion for stop).

We conclude, therefore, that to spare the cocaine from suppression, the Commonwealth bears the burden of proving attenuation even if the defendant did not have a reasonable expectation of privacy in the crawl space of his residence where the cocaine was found.[7]

---

[7] Because we conclude infra that the Commonwealth has not met its burden of proving attenuation, we need not decide whether the defendant in fact had a reasonable expectation of privacy in that crawl space. Accordingly, we do not consider whether the Appeals Court's legal analysis was consistent with

3.  Attenuation.  The Commonwealth contends that it has met its burden to establish sufficient attenuation because the causal chain between the illegal CSLI search -- the "poisonous tree" -- and the subsequent discovery of the cocaine -- the "fruits" -- was broken by the defendant's consent to the search of his residence.  We agree that, under certain circumstances, a defendant's voluntary consent to a search of his residence may be an intervening event that constitutes adequate attenuation, thus allowing the evidence found during the search to be admitted in evidence.  For instance, in Damiano, 444 Mass. at 456, 459, where the defendant voluntarily consented to a search of his home after he learned that the police had secured the premises with his wife and child present and that the police intended to obtain a search warrant, we concluded that the consent was an intervening event that sufficed to prove adequate attenuation from the illegal interception of the defendant's communications by a private citizen.

But a defendant's consent to search, like a defendant's consent to waive his or her right to silence after being given Miranda warnings, does not automatically attenuate the taint of

_____

our opinion in Commonwealth v. Leslie, 477 Mass. 48, 54 (2017), where we held that "in cases involving a search in a multifamily home, the validity of the search [does not turn] on the defendant's exclusive control or expectation of privacy in the area searched" (emphasis added).

an illegality. See Brown v. Illinois, 422 U.S. 590, 602-603 (1975) ("If Miranda warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, . . . the effect of the exclusionary rule would be substantially diluted"). A defendant's consent to a search cannot constitute adequate attenuation where the consent itself is tainted by the illegality because it was obtained through exploitation of the fruits of the illegal search. See Commonwealth v. Midi, 46 Mass. App. Ct. 591, 595 (1999) ("When consent to search is obtained through exploitation of a prior illegality, particularly very close in time following the prior illegality, the . . . compromised consent has been thought to be tainted and inadmissible"). See also Brown, supra at 603 (where defendant made admissions after unlawful arrest, attenuation depends on whether defendant "act[ed] of [his or her] free will unaffected by the initial illegality"); Estabrook, 472 Mass. at 864-865 (where defendant was confronted with evidence obtained from CSLI in close proximity to illegality, statements made in direct response must be suppressed); Commonwealth v. Fielding, 371 Mass. 97, 113 (1976) (defendant's statements may be "fatally infected" where "the connection between the illegality and the making of the statements is sufficiently intimate").

In determining whether the Commonwealth has met its burden of proving that the defendant's consent was not tainted by

evidence obtained from the illegal CSLI search, we consider three factors:  (1) the amount of time that elapsed between the defendant being confronted with the illegally obtained CSLI evidence and his grant of consent; (2) the presence of any intervening circumstances during that time period;[8] and (3) "the purpose and flagrancy of the official misconduct."  See Damiano, 444 Mass. at 455, citing Kaupp v. Texas, 538 U.S. 626, 633

---

[8] The attenuation analysis regarding whether a defendant's consent is tainted by an illegal search must differ somewhat from the analysis regarding whether a defendant's postarrest statements are tainted by an illegal arrest.  See United States v. Crawford, 372 F.3d 1048, 1054 (9th Cir. 2004) (en banc), cert. denied, 543 U.S. 1057 (2005) ("The analysis that applies to illegal detentions differs from that applied to illegal searches").  The potential taint arising from an illegal arrest generally comes from the custody arising from the arrest, so the temporal proximity consideration focuses on the time that has elapsed between the arrest and the statements at issue, and any intervening circumstances that occurred between those two events.  See Commonwealth v. Fielding, 371 Mass. 97, 114 (1976) (three-hour period between arrest and confession, during which defendant decided against assistance of counsel, sufficient to attenuate confession from unlawful arrest).  And the giving of Miranda warnings is designed to diminish the coercive effect of custodial questioning.  Commonwealth v. Simon, 456 Mass. 280, 290, cert. denied, 562 U.S. 874 (2010) (recognizing that Miranda warnings serve to "counteract[] the coercion inherent in custodial interrogation").  In contrast, the potential taint arising from an illegal search generally comes from the defendant being confronted with the information derived from the illegal search, which may influence what the defendant says and his or her willingness to consent to a search.  See United States v. Shetler, 665 F.3d 1150, 1158 (9th Cir. 2011).  Therefore, the temporal proximity consideration in the context of this case focuses on the time that elapsed between the defendant being confronted with the information illegally derived from the CSLI search and the defendant's statements or consent, and any intervening circumstances that occurred between these two events.

(2003) (per curiam).  See also Commonwealth v. Tuschall, 476 Mass. 581, 589 (2017); United States v. Shetler, 665 F.3d 1150, 1159 (9th Cir. 2011).

As to the first and second factors, the defendant's consent was obtained immediately after Telford informed him that the police knew he "had just gone down to Florida and purchased a large amount of narcotics and . . . [was] possibly storing it there" (emphasis added), information that was intimately intertwined with the information gleaned from the unlawful CSLI tracking.  The temporal proximity between the trooper confronting the defendant with information obtained through the illegal CSLI tracking and the defendant's grant of consent to search, and the absence of intervening events between that confrontation and his consent, weigh heavily in favor of the motion judge's conclusion that the Commonwealth has failed to meet its burden of proving that it did not exploit the illegally obtained information in obtaining the consent to search.  See Estabrook, 472 Mass. at 865 (finding no attenuation between illegal CSLI search and defendant's statement because "there were no intervening circumstances between the police questions based on the CSLI and [defendant's] responses thereto"); Shetler, 665 F.3d at 1159 (concluding that there was "causal connection between the illegal searches and [defendant's] statements, particularly because [government] agents may have

confronted [defendant] with illegally seized evidence during the interview"). Although we can never know the reason why the defendant consented to the search, we cannot eliminate the possibility that the grant of consent was influenced by the information Telford had just told him, which might have caused him to believe that the refusal to consent would be futile because it would simply trigger an application for a search warrant of his home. See Shetler, supra at 1158 ("the answers the suspect gives to officials questioning him may be influenced by his knowledge that the officials had already seized certain evidence"). See generally LaFave, supra at § 11.4(c), at 401 ("Confronting a suspect with illegally seized evidence tends to induce a confession by demonstrating the futility of remaining silent" [citation omitted]).

The Commonwealth argues that the defendant's consent was not influenced by the fruits of the illegal CSLI search because the police had independently learned -- apart from the CSLI tracking -- that the defendant lived at the residence and that he had just returned from a drug deal in Florida. It contends that the police knew from Kennel that the defendant was going to New York in the brown Toyota vehicle with Cassio, knew from a confidential informant that Cassio was traveling to Florida to purchase drugs, knew from stopping the vehicle after the defendant had just been dropped off at his residence that they

had just returned from an extended trip, and knew from the defendant that he had been in Florida.

But nothing about Kennel's statement to the police suggested that the defendant was going beyond New York. And the confidential informant's tip did not mention the defendant and gave the police no information about when Cassio would return. The police began to monitor the defendant's residence only when they learned from the CSLI that the vehicle in which he was riding was about to enter Massachusetts. They stopped the vehicle only because the physical surveillance -- triggered by what the police learned from the CSLI -- spotted Cassio and a person they thought might be Dorisca leaving the residence. And the police entered the multiunit house and sought the defendant's consent to search his residence only because they knew from the CSLI that Cassio and the defendant had just returned from Florida and that the defendant might be in possession of the drugs that he and Cassio were believed to have purchased. See United States v. Finucan, 708 F.2d 838, 843 (1st Cir. 1983) (government "impermissibly exploited illegally seized material" when it "relied upon information obtained from the seized documents in guiding [its] investigation"). Therefore, we conclude that Telford's statement to the defendant that the police knew he "had just gone down to Florida and purchased a large amount of narcotics and . . . [was] possibly storing it

there" was derived from the poisonous CSLI tree and was not independently derived information.

As to the third factor -- "the purpose and flagrancy of the official misconduct" -- we recognize that the illegal police misconduct here was neither purposeful nor flagrant. The police obtained judicial approval for the CSLI search pursuant to 18 U.S.C. § 2703(d) in 2008, six years before our decision in Augustine declared that CSLI could be obtained only through a search warrant supported by probable cause. We declared in Augustine, 467 Mass. at 257, that "this opinion clearly announces a new rule," noting that "neither the statute, 18 U.S.C. § 2703(d), nor our cases have previously suggested that police must obtain a search warrant in addition to a § 2703(d) order before obtaining an individual's CSLI from his or her cellular service provider."

Although this factor favors the Commonwealth, it is not dispositive. See Tuschall, 476 Mass. at 589 (concluding that "[t]he balance of the [attenuation] factors . . . favors the defendant" in suppression analysis even though "there was no misconduct" by police). We do not recognize a "good faith" exception to either the exclusionary rule or the attenuation

doctrine.[9]  See Commonwealth v. Hernandez, 456 Mass. 528, 533

(2010) ("We have not adopted the 'good faith' exception [to

exclusionary rule] for purposes of art. 14 . . ."); Commonwealth

---

[9] Justice Cypher, in concurring in part and dissenting in part, contends that we should abandon our long-standing precedent and adopt the good faith exception to the exclusionary rule.  We will not here address the merits of that argument because the Commonwealth did not argue it below or on appeal and it is therefore waived.  See Commonwealth v. Alexis, 481 Mass. 91, 101 (2018) ("the Commonwealth waived any argument . . . raised neither below nor on appeal"); Commonwealth v. Bettencourt, 447 Mass. 631, 634 (2006) ("Our system is premised on appellate review of that which was presented and argued below").

Justice Cypher errs where she states that the issue of the good faith exception to the exclusionary rule "was adequately raised by the Commonwealth when it discussed attenuation."  Post at note 5.  The good faith exception to the exclusionary rule is substantively different from the consideration of police misconduct in determining attenuation.  Under a good faith exception, evidence is admissible even if it is unconstitutionally obtained, so long as the police acted in good faith.  See United States v. Leon, 468 U.S. 897, 922 (1984) (fruits of search admissible where police prove that they acted "in objectively reasonable reliance on a subsequently invalidated search warrant"); United States v. Diehl, 276 F.3d 32, 43 (1st Cir.), cert. denied, 537 U.S. 834 (2002) (applying good faith exception where officer mistakenly invaded curtilage of home to obtain drug evidence).  In the attenuation analysis, however, the "purpose and flagrancy of the official misconduct" is simply one factor of several to be considered.  Commonwealth v. Damiano, 444 Mass. 444, 455 (2005).  The absence of police misconduct is not determinative of attenuation.  See Commonwealth v. Tuschall, 476 Mass. 581, 589-590 (2017).  Recognizing these considerations, the Commonwealth, citing Damiano, referenced the lack of police misconduct as only one factor in its broader discussion of attenuation.  Therefore, the Commonwealth cannot be said to have raised the issue whether to adopt a good faith exception, and the issue must be deemed waived.  See Nelson v. Adams USA, Inc., 529 U.S. 460, 469 (2000) ("issues must be raised in lower courts in order to be preserved as potential grounds of decision in higher courts").

v. Upton, 394 Mass. 363, 370 & n.5 (1985) (G. L. c. 276, §§ 1, 2A, and 2B, "bar any judicial consideration of admitting evidence seized pursuant to a search warrant issued without a showing of probable cause, even if the officer executing the warrant was proceeding in objectively reasonable reliance on the warrant").  In Estabrook, 472 Mass. at 854, 864-865, where the CSLI also was obtained before our Augustine decision, we suppressed a defendant's statements to police where the statements were made "in close proximity to the illegality, and there were no intervening circumstances between the police questions based on the CSLI and [the defendant's] responses thereto."  The facts of this case compel the same result. Contrast Damiano, 444 Mass. at 458 (where illegal interception was done by private citizen rather than police in violation of Federal wiretap statute, "the complete lack of police involvement in the underlying illegal interception is not an insignificant fact in assessing the necessary reach of the exclusionary rule and the adequacy of the attenuating circumstances").

In sum, we agree with the motion judge that the Commonwealth has failed to meet its burden of proving that it did not exploit the illegally obtained CSLI in obtaining the defendant's consent to search, where that consent was intimately intertwined -- both temporally and causally -- with the

information gleaned from the unlawful CSLI tracking and was obtained immediately after Telford confronted the defendant with that information.

Conclusion. The order of the Superior Court judge granting the defendant's motion to suppress is affirmed.

So ordered.

LOWY, J. (concurring).  While the court's outcome is legally correct under present law, I appreciate the call, in Justice Cypher's opinion concurring in part and dissenting in part, for Massachusetts to recognize a good faith exception to the exclusionary rule.  As Justice Cypher's opinion emphasizes, "The primary purpose of the exclusionary rule is to deter future police misconduct by barring, in a current prosecution, the admission of evidence that the police have obtained in violation of rights protected by the Federal and State Constitutions." Commonwealth v. Santiago, 470 Mass. 574, 578 (2015).  See Davis v. United States, 564 U.S. 229, 236-237 (2011); United States v. Leon, 468 U.S. 897, 909 (1984).  There is no deterrent value in suppressing evidence "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful." Davis, supra at 238, quoting Leon, supra.  On the other hand, there is value in the certainty that a constitutional violation will have consequences.

However, since Massachusetts has never recognized the "good faith" exception, Commonwealth v. Valerio, 449 Mass. 562, 569 (2007), adopting this exception to the exclusionary rule would be a significant departure from our present jurisprudence.  Such a departure, in my opinion, should not be made in a situation where neither party raised the issue, either below or before this court.  So although I recognize the potential benefits to

adopting a good faith exception to the exclusionary rule in the Commonwealth, such a major question would be best answered after both sides to the argument are presented to the court and we determine whether to adopt or reject such a change after due consideration.

CYPHER, J. (concurring in part and dissenting in part).
The Commonwealth concedes that the cell site location
information (CSLI) tracking of Cassio Vertil's (Cassio's)
cellular telephone (cell phone) was unlawful because it was not
authorized by a search warrant.  It argues, however, that the
defendant did not have standing to challenge the unlawful
tracking.  I agree with the court that under Commonwealth v.
Rousseau, 465 Mass. 372, 382 (2013), the defendant has standing
to challenge the search of Cassio's cell phone because his
movements were tracked for six days.[1]  Because the electronic

---

[1] In Commonwealth v. Rousseau, 465 Mass. 372, 382 (2013), we
concluded that "under art. 14 [of the Massachusetts Declaration
of Rights], a person may reasonably expect not to be subjected
to extended [global positioning system] electronic surveillance
by the government, targeted at his movements, without judicial
oversight and a showing of probable cause."  We did not decide
how broadly such an expectation might reach and to what extent
it may be protected.  Id.  However, the fact that police
monitored Rousseau over a thirty-one-day period was sufficient
to establish that he had standing to challenge the validity of
the warrant.

Here, the defendant was targeted for substantially less
time -- six days -- than the defendant in Rousseau.  The court
does not recognize any distinction between the two time frames.
I too think it is difficult to do so without creating an
arbitrary time frame.  The length of time must be considered on
a case-by-case basis.

I also think it is important to emphasize that while the
passenger here and in Rousseau were both "targets" of the
tracking, we have not yet adopted "target" standing in
Massachusetts.  See Commonwealth v. Santiago, 470 Mass. 574,
577-578 (2015).  However, we have indicated that
"[u]nconstitutional [searches of] small fish intentionally

tracking of the cell phone was ongoing while police searched the defendant's apartment and there was no temporal break between the unlawful police activity and the search of the defendant's apartment, I also agree that the defendant's consent to search his apartment was not attenuated from the police's illegal conduct.  See Commonwealth v. Gentile, 466 Mass. 817, 831 (2014).  And I agree, albeit not based on the Massachusetts support cited by the court, that the fruits of that search -- the cocaine -- must be suppressed, even though the defendant had no reasonable expectation of privacy in the crawl space.[2]  See

_____

undertaken in order to catch big ones may have to be discouraged by allowing the big fish, when caught, to rely on the violation of the rights of the small fish, as to whose prosecution the police are relatively indifferent" (citation omitted).  Id. That is clearly not the case here, or in Rousseau.  It is important to understand the distinction between "target standing," which permits a criminal defendant who is the "target" of a search, i.e., the big fish, to contest the legality of that search and object to the admission at trial of evidence obtained as a result of the search, see id., and the standing recognized in Rousseau and by the court here, which emphasizes that a person who is specifically tracked for an extended period of time has standing to contest that search.  I would not necessarily conclude that an incidental passenger in a car that was being tracked would have standing to challenge a search.

[2] The court does not reach the issue of whether the defendant had a reasonable expectation of privacy in the crawl space where the cocaine was discovered.  See ante at note 7. The court states, "[W]e do not consider whether the Appeals Court's legal analysis was consistent with our opinion in Commonwealth v. Leslie, 477 Mass. 48, 54 (2017), where we held that 'in cases involving a search in a multifamily home, the validity of the search [does not turn] on the defendant's

Jones v. United States, 168 A.3d 703, 722-723 (D.C. 2017).  See

generally 6 W.R. LaFave, Search and Seizure:  A Treatise on the

Fourth Amendment § 11.4, at 325-326 (5th ed. 2012) ("If the

_____

exclusive control or expectation of privacy in the area searched'" (emphasis added).  Ante at note 7.  Leslie, supra, instructs that we apply the same curtilage analysis to multiunit homes as we do to single-family homes, where in the past we have held that a tenant does not have a reasonable expectation of privacy in a "common area" in an apartment building, see Commonwealth v. Thomas, 358 Mass. 771, 774-775 (1971).

If I were not constrained to conclude that the cocaine must be suppressed as fruit of the illegal search of the cell phone, and if I were to decide the crawl space issue, I would conclude that the defendant did not have a reasonable expectation of privacy in the crawl space.  Applying the four-factor test introduced in United States v. Dunn, 480 U.S. 294, 301 (1987), which we adopted in Leslie, 477 Mass. at 55, I would conclude that the crawl space was not "so intimately tied to the [defendant's apartment] itself that it should be placed under the [apartment's] 'umbrella' of Fourth Amendment protection." Id., quoting Dunn, supra.  See Commonwealth v. Fernandez, 458 Mass. 137, 142 (2010) ("In the context of a curtilage determination, we undertake our independent review cognizant that there is no finely tuned formula that demarcates the curtilage in a given case" [quotation and citation omitted]).

I do not read the Leslie decision as granting multiunit apartment buildings the same broad protection as a single-family home.  Although the court in Leslie expanded the protection that may be given curtilage in such circumstances, the facts must still be analyzed.  Otherwise, an overly broad interpretation may lead to results that are inconsistent with the over-all framework of our search and seizure jurisprudence.  For example, the broadest reading of Leslie would require us to conclude that a tenant on the first-floor apartment has the same constitutional protections in his own apartment as he does in a separate apartment on the second floor.  Although the crawl space is enclosed within the four walls of the apartment building, it does not necessarily warrant the same protections as the areas enclosed inside the four walls of a single-family home.  The Dunn factors were applied in Leslie.  I would apply them here.

defendant does have standing with respect to the poisonous tree, that alone suffices" to challenge admissibility of its fruits).

I dissent because I think that it is time that we adopt a good faith exception to the exclusionary rule in circumstances, such as here, where at the time the police sought judicial permission to track the cell phone, they were properly complying with the law, namely, the Stored Communications Act, 18 U.S.C. § 2703(d) (2006) (SCA).

1. Reasonable expectation of privacy in the crawl space. I start by briefly highlighting that we have never articulated that any fruit, even those fruits in areas where the defendant does not have a reasonable expectation of privacy, must be suppressed if its discovery flows from an illegal search. The court concludes that the tracking of Cassio's CSLI was illegal, the defendant's consent to search his apartment did not remove the taint of the initial illegality, and therefore all evidence against the defendant must be suppressed. The court determines that we need not address whether the defendant had a reasonable expectation of privacy in the crawl space where the cocaine was found because "we have repeatedly held that persons subjected to an illegal seizure were entitled to suppress the fruits of that seizure even where the evidence was discovered in places where it is indisputable that the person in question did not have a reasonable expectation of privacy." See ante at    . To

support this proposition, the court cites three cases.  See

Commonwealth v. Warren, 475 Mass. 530, 533, 540 (2016);

Commonwealth v. Rodriguez, 456 Mass. 578, 587 (2010);

Commonwealth v. O'Laughlin, 25 Mass. App. Ct. 998, 998-999

(1988).  These three cases all are inapposite to the facts and

circumstances of the present case and do not fully support the

broad proposition that any fruit, even those fruits in areas

where the defendant does not have a reasonable expectation of

privacy, must be suppressed if its discovery flows from an

illegal search.[3]

The court does point to Federal law, however, in support of

its position.  See United States v. Olivares-Rangel, 458 F.3d

1104, 1117 (10th Cir. 2006) ("While the fruit of the poisonous

---

[3] In Commonwealth v. Rodriguez, 456 Mass. 578, 587 (2010), we stated that if a defendant drops contraband on the ground in a public park after he was stopped in the constitutional sense, the drugs could be suppressed as fruits of an unlawful seizure if the stop was not supported by reasonable suspicion.  Both Commonwealth v. Warren, 475 Mass. 530, 533 (2016), and Commonwealth v. O'Laughlin, 25 Mass. App. Ct. 998, 999 (1988), are cases in which the defendant discarded contraband while fleeing from police.  In those cases, we suppressed the evidence because police did not have reasonable suspicion to stop the defendant.  See Warren, supra at 540; O'Laughlin, supra at 999-1000.  The results in these cases flow from our decision in Commonwealth v. Stoute, 422 Mass. 782, 789 (1996), in which we held that art. 14 provides more protection than the Fourth Amendment to the United States Constitution in defining the moment at which a person's personal liberty has been significantly restrained by the police, so that he or she may be said to have been seized within the meaning of art. 14.  Contrast California v. Hodari D., 499 U.S. 621, 629 (1991).  Thus, we did not use an attenuation framework in these cases.

tree doctrine applies only when the defendant has standing regarding the Fourth Amendment violation which constitutes the poisonous tree, . . . the law imposes no separate standing requirement regarding the evidence which constitutes the fruit of that poisonous tree"); United States v. Green, 275 F.3d 694, 699 (8th Cir. 2001).  Historically, we have often granted greater protections to defendants under art. 14 of the Massachusetts Declaration of Rights than the protections provided under the Fourth Amendment to the United States Constitution.  See Commonwealth v. Alexis, 481 Mass. 91, 98-99 (2018), and cases cited.  For this reason, I am inclined to think that although we have never specifically stated it, we would come to the same conclusion as the Federal courts and declare that fruits, such as the cocaine here, should be suppressed.

2.  The exclusionary rule.  The Commonwealth obtained CSLI from Cassio's cell phone in 2008 pursuant to an SCA order that the Commonwealth properly sought and obtained.  Under the SCA, a court may order a telephone company to produce records, including CSLI records, "if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the . . . records or other information sought . . . are relevant and material to an ongoing criminal investigation."  18 U.S.C. § 2703(d).  In 2014, six years after

the Commonwealth lawfully obtained the CSLI, we held that the government must secure a warrant before accessing CSLI records. Commonwealth v. Augustine, 467 Mass. 230, 254-255 (2014), S.C., 470 Mass. 837 and 472 Mass. 448 (2015).  Four years after Augustine, the United States Supreme Court held that the government acquisition of CSLI records constitutes "a search within the meaning of the Fourth Amendment."[4]  Carpenter v. United States, 138 S. Ct. 2206, 2220 (2018).

In any consideration of police conduct, we must be cognizant that "[r]easonableness [is] the 'touchstone'" of art. 14 and the Fourth Amendment.  Commonwealth v. Roland R., 448 Mass. 278, 281 (2007), quoting Commonwealth v. Gaynor, 443 Mass. 245, 256 (2005).  The contours of reasonableness are drawn by a consideration of the nature of the intrusion into the privacy interest at play, Commonwealth v. Feyenord, 445 Mass. 72, 86 (2005) (Greaney, J., concurring), cert. denied, 546 U.S. 1187 (2006), and the nature of the law enforcement interest at stake. "The primary purpose of the exclusionary rule is to deter future

---

[4] In Commonwealth v. Augustine, 467 Mass. 230, 232, 254-255 (2014), S.C., 470 Mass. 837 and 472 Mass. 448 (2015), because there was no Federal or Massachusetts decision regarding whether obtaining CSLI data was a search in the constitutional sense, we remanded the case to the Superior Court to determine whether the application pursuant to 18 U.S.C. § 2703(d) established probable cause.  Here, I agree with the Appeals Court and conclude that a remand is not necessary because the application in 2008 cannot establish probable cause.

police misconduct by barring, in a current prosecution, the admission of evidence that the police have obtained in violation of rights protected by the Federal and State Constitutions." Commonwealth v. Santiago, 470 Mass. 574, 578 (2015). "[W]here 'the exclusionary rule does not result in appreciable deterrence, then, clearly, its use . . . is unwarranted.'" Commonwealth v. Wilkerson, 436 Mass. 137, 142 (2002), quoting United States v. Janis, 428 U.S. 433, 454 (1976). Another consideration is the protection of judicial integrity through the dissociation of the courts from unlawful conduct. See Commonwealth v. Ford, 394 Mass. 421, 433 (1985) (Lynch, J., dissenting). Where those purposes are not furthered, rigid adherence to a rule of exclusion can only frustrate the public interest in the admission of evidence of criminal activity. Commonwealth v. Brown, 456 Mass. 708, 715 (2010).

The Supreme Court recognizes a "good faith" exception to the exclusionary rule where the government "act[s] with an objectively reasonable good-faith belief that their conduct is lawful" (quotation and citation omitted). Davis v. United States, 564 U.S. 229, 238 (2011). We have not adopted the good faith exception to the exclusionary rule, yet we have never specifically articulated why art. 14 might prohibit us from doing so. Instead, where the good faith exception has been addressed and not reflexively dismissed, our cases have focused

on whether the violations are substantial and prejudicial.  See

ante at    .  See Commonwealth v. Hernandez, 456 Mass. 528, 533

(2010); Commonwealth v. Rutkowski, 406 Mass. 673, 677 (1990).

We have said that "the mere fact that an unlawful search and

seizure has occurred should not automatically result in the

exclusion of any illegally seized evidence."  Commonwealth v.

Gomes, 408 Mass. 43, 46 (1990).  See, e.g., Commonwealth v.

Holley, 478 Mass. 508, 525 (2017) (warrant did not comply with

particularity requirement or limit scope of search, but

defendant "suffered no prejudice"); Hernandez, supra;

Commonwealth v. Beldotti, 409 Mass. 553, 559 (1991).

Using the standard that has been articulated to determine

whether to exclude evidence obtained as a result of an illegal

search or seizure, we balance (1) the degree to which the

violation undermined the principles underlying the governing

rule of law, and (2) the extent to which exclusion will tend to

deter such violations from being repeated in the future.  Gomes,

408 Mass. 46.  See Hernandez, 456 Mass. at 532 (exclusion is

deterrent to abuse of official power based on application of

State legal principles); Wilkerson, 436 Mass. at 142;

Commonwealth v. Benoit, 382 Mass. 210, 216 (1981), S.C., 389

Mass. 411 (1983) (exceptions to strict application of

exclusionary rule are justified when deterrence rationale is

outweighed by competing societal interest in convicting guilty).

Where we have allowed the introduction at trial of evidence that was obtained through an illegality, it has usually turned on whether there was a technical error in procuring a warrant, not whether the police conduct was legal at the time the warrant was procured.  See Holley, 478 Mass. at 525-526; Rutkowski, 406 Mass. at 677.

With the touchstone of art. 14 in mind, I think that it is time we adopt the good faith exception to the exclusionary rule in circumstances, such as here, where the police had an objectively reasonable good faith belief that their conduct was lawful at the time they applied for the SCA order.  See Illinois v. Krull, 480 U.S. 340, 350 (1987) ("Penalizing the officer for the [legislature's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations" [citation omitted]).

Here, police fully complied with the terms of § 2703(d), which authorized the release of CSLI.  Police acted in good faith in seeking the SCA order and in relying on what they (and the judge issuing the order) reasonably understood was the existing law at the time.  In 2008, no precedent -- whether Federal or in the Commonwealth -- indicated that the use of § 2703(d) to obtain CSLI was unconstitutional.  There was nothing to suggest to the government that it reasonably could not rely on the statutory scheme set forth in § 2703(d).

Therefore, I would hold that the fact that Augustine subsequently invalidated any means of obtaining CSLI without probable cause and a warrant does not require suppression of CSLI obtained six years earlier in 2008. See Brown, 456 Mass. at 715 ("Judicial integrity . . . is hardly threatened when evidence properly obtained under Federal law, in a federally run investigation, is admitted as evidence in State courts. To apply the exclusionary rule in these circumstances . . . would plainly frustrate the public interest disproportionately to any incremental protection it might afford"). See also United States v. Adkinson, 916 F.3d 605, 611 (7th Cir. 2019); United States v. Goldstein, 914 F.3d 200, 203 (3d Cir. 2019) (even though collection of evidence violated Fourth Amendment, prosecutors relied on objectively good faith belief that obtaining defendant's data was legal under § 2703[d]); United States v. Curtis, 901 F.3d 846, 849 (7th Cir. 2018) ("though it is now established that the Fourth Amendment requires a warrant for the type of cell-phone data present here, exclusion of that information was not required because it was collected in good faith"); United States v. Zodhiates, 901 F.3d 137, 143 (2d Cir. 2018), cert. denied, 139 S. Ct. 1273 (2019) (good faith exception to exclusionary rule applies to CSLI, obtained prior to Supreme Court's decision in Carpenter, pursuant to § 2703[d] because search was made in "objectively reasonable reliance on

appellate precedent existing at the time of the search").  See generally Commonwealth v. Gonzalez, 90 Mass. App. Ct. 100, 106 (2016).

Because the SCA order was sought and issued on an informed understanding of State constitutional principles in place in 2008 and because there is no suggestion of misconduct by any agent of the Commonwealth, the suppression of the evidence obtained pursuant to the order would disserve the enduring deterrent rationale of the exclusionary rule.  See Hernandez, 456 Mass. at 532; Gomes, 408 Mass. at 46.  Accordingly, even if obtained in violation of art. 14, the CSLI at issue should be admitted.[5]

---

[5] The court does not reach the issue of the good faith exception on the ground that the issue was not raised.  I think the issue was adequately raised by the Commonwealth when it discussed attenuation.  The court notes that "the good faith exception to the exclusionary rule is substantively different from the consideration of police misconduct in determining attenuation."  See ante at note 9.  I disagree.  While police misconduct is but one factor in our attenuation analysis, that factor is sufficiently intertwined, in this case, with the question whether the police acted in good faith that I do not see a meaningful distinction.  See Davis v. United States, 564 U.S. 229, 238 (2011) (good faith exception to exclusionary rule applies where police "act with an objectively reasonable good-faith belief that their conduct is lawful").  That being said, I recognize that the two concepts are not one and the same.  I agree with the court that the defendant's consent was not attenuated from the search of his cell phone, mainly because the search was ongoing while the police approached the defendant's door.  However, I reiterate that whenever we discuss the exclusionary rule, whether it be in the purview of attenuation or good faith, the touchstone of art. 14 is reasonableness.  The

Commonwealth argued that the police acted in good faith under Commonwealth v. Damiano, 444 Mass. 444, 455 (2005). Keeping in mind the primary purpose of the exclusionary rule -- to deter police misconduct -- I would give the Commonwealth the benefit in applying that reasoning to the overarching theme of the good faith exception. See Santiago, 470 Mass. at 578.